[Crim. No. 26.   Third Appellate District.—July 18, 1906.]

## THE PEOPLE, Respondent, v. GEORGE HEMPLE, Appellant.

CRIMINAL LAW—EMBEZZLEMENT—CONTINUANCE OF TRUST—SUFFICIENCY OF INFORMATION.—An information for embezzlement which charges that defendant on a certain day received the money as agent and servant of another, and that he thereafter, on the same day, willfully, unlawfully, feloniously and fraudulently did embezzle, convert and appropriate the same to his own use, and not in the due and lawful execution of his trust, sufficiently charges the continuance of the trust up to and including the time of the alleged conversion, and is sufficient.

ID.—PROOF REQUIRED OF EACH ESSENTIAL ELEMENT OF OFFENSE.—There are four essential elements of the offense of embezzlement by an agent which must concur, and each of which must be proved beyond a reasonable doubt, viz.: 1. That defendant was such agent; 2. That the embezzled property was received by him as that of his employer; 3. That he received it in the course of his employment; and 4. That he appropriated it to his own use with intent to steal it.

ID.—AGENTS EMPLOYED IN THEATER—SALE OF TICKETS—EVIDENCE DE-
STROYED BY COAGENT—INADMISSIBLE MEMORANDUM.—Where defend-
ant and a coagent of the same employer were engaged in selling
tickets in a theater, and defendant testified that he put in the money
drawer all receipts from tickets sold by him, and appropriated
none to his own use, and it was there when the agent took charge
of sales, and such coagent did not testify that he put all money
received by him into the drawer, and testified that after looking
over the accounts and finding a shortage, and after paying the
theatrical manager his percentage, he destroyed all stubs and tickets,
and could only testify to the accounts from a memorandum made
by him at the time, he being equally liable with defendant for the
same money, such memorandum was, under the circumstances, a mere
self-serving declaration, and the court erred in admitting it in evi-
dence.

ID.—CONTENTS OF RECEIPT—HEARSAY EVIDENCE—RIGHTS OF DEFEND-
ANT.—The testimony of the coagent to the contents of a receipt
claimed to have been signed in a book not placed in evidence, and
to show payment of an agreed percentage of all tickets sold to the
manager of the theatrical company, is inadmissible hearsay against
the defendant who is entitled to be confronted personally with such
manager as a witness against him for purpose of cross-examination.

ID.—INSUFFICIENCY OF COMPETENT EVIDENCE—NEW TRIAL.—Where,
aside from the inadmissible memorandum and the inadmissible con-
tents of the receipt testified to, there was no other evidence tend-
ing to show that defendant received more money than he left in
the hands of the coagent, a new trial must be granted on account of
the error in admitting such evidence.

ID.—CUSTOM AS TO DESTRUCTION OF STUBS AND TICKETS—KNOWLEDGE
OF SHORTAGE.—The fact that on redirect examination the coagent
testified that it was a custom to destroy stubs and unsold tickets af-
ter a performance cannot affect the question. If there was a short-
age of money he knew it, and claimed to have suspected the de-
fendant of stealing it, and having the same opportunity of taking
the money that defendant had, he would most naturally have saved
the evidence by which the crime might have been fastened upon the
defendant.

ID.—EVIDENCE OF FLIGHT—PROVINCE OF JURY.—Where there was evi-
dence for and against the theory that the defendant fled, and there
seems to have been no concealment or attempt to keep out of the
way of the officers, but there was some evidence tending to show
flight, it is for the jury to determine its weight.

ID.—INSTRUCTIONS—DUTY OF APPELLANT'S COUNSEL.—It is the duty of
counsel for appellant to point out the specific instruction embodied
in the charge of the court, which he believes does not state the
law, so that the appellate court may properly test the same.

Id.—Harmless Modification of Requested Instructions.—The court should give instructions requested by the defendant which clearly express the law in the language asked, but it is not reversible error to modify instructions' where the modification amounts but to a change of words in expressing the same thing.

Id.—Improper Refusal of Instruction—Reasonable Doubt as to Guilty Party.—It was prejudicial error to refuse to give an instruction as requested by the defendant that "if the jury find from a consideration of all the evidence that it points as clearly to some other person as the person who committed the crime in question, as it does to the defendant, or if after a fair and full consideration of the evidence the jury entertained a reasonable doubt as to whether defendant or some other person is the guilty party, it is their duty to acquit the defendant," where there is evidence making such instruction applicable.

Id.—Rights of Defendant as to Instructions.—A defendant is entitled to have an instruction given when it announces the law, responsive to every element of his defense shown by the evidence.

APPEAL from a judgment of the Superior Court of San Joaquin County, and from an order denying a new trial. W. B. Nutter, Judge.

The facts are stated in the opinion of the court.

T. J. Butts, for Appellant.

U. S. Webb, Attorney General, for Respondent.

BUCKLES, J.—The defendant was charged with embezzling $142.50, convicted, moved for a new trial, which was denied, and was then sentenced to five years' imprisonment.

He appeals from the order denying a new trial and from the judgment.

The charging part of the information is as follows: "The said George Hemple was agent and servant to one C. P. Hall, and being agent and servant as aforesaid, by virtue of his said employment as such agent and servant, there came into the care and control of the said George Hemple, for and on account of the said C. P. Hall, the sum of one hundred forty-two and fifty one-hundredths ($142.50) dollars, lawful money of the United States, and the said George Hemple aforesaid,

so received and took into his control and care the said money for and on account of the said C. P. Hall, and afterward, to wit, on the 5th day of December, 1902, at and in said County and State, the said George Hemple willfully, unlawfully, feloniously and fraudulently did embezzle, convert and appropriate the same to his own use, and not in the due and lawful execution of the said trust of him, the said George Hemple, . . .''

The information is assailed on the ground that it is not charged therein that the defendant was the agent of Hall at the time of the alleged conversion.

It is charged that defendant received the money as the agent and servant of Hall and that he thereafter unlawfully, willfully, feloniously and fraudulently did embezzle, convert and appropriate the same to his own use and not in the due and lawful execution of the said trust. We think this language sufficiently charges the continuance of the trust up to and including the time of the alleged conversion. The allegation is that he received the money on December 5th, and converted it the same day. That he was in the possession of it, if at all, as the agent and servant of Hall, there could be no doubt. He is distinctly charged with having received the money for and on account of Hall and of having feloniously embezzled and converted it to his own use, and not in the due and lawful execution of his trust.

The information was sufficient. (*People* v. *Johnson,* 71 Cal. 384, [12 Pac. 261]; *People* v. *Gordon,* 133 Cal. 328, [85 Am. St. Rep. 174, 65 Pac. 746]; *People* v. *McLean,* 135 Cal. 306, [167 Pac. 707]; *People* v. *Goodrich,* 142 Cal. 216, [75 Pac. 796].)

The facts are as follows: The defendant was in the employ of C. P. Hall in the theatrical business. His duties under such employment were to advertise coming attractions, prepare tickets for sale of seats, sell them, receive the money therefor, safely keep the same and turn it over to Hall or his agent, Henry, on the night of the performance.

On December 5, 1902, the "Florodora Company" gave a performance at the Yosemite theater in Stockton. About a week prior to that time, Henry had given defendant instructions about the sale of tickets and the prices to be charged for seats in different parts of the theater, and the defendant began the sale of these tickets at the box office of the theater

about the first day of December, and continued selling up to shortly after noon on the 5th, when Henry arrived at the box office and took charge. There had been some controversy about the salary defendant was to have.

He had been at work at this employment for at least two months and was demanding $75 per month, but had been paid only $50 per month for the two months he had worked up to December 1st. When he learned from Henry that Hall would not pay $75 per month, he left the box office and never returned. He says he informed Henry as he left that he would work no more at the wages paid and did not care for that kind of work any more and that he was through, and he did quit and left Mr. Henry in charge at the box office. The defendant says he knew the different prices at which he was to sell the tickets and he did sell them at such prices—but no price is mentioned—and put the money for all the tickets he sold in the till, and, so far as he knew, it was all there when he left on the 5th, and that he never appropriated any of it.

The testimony of defendant further shows that on the 5th of December, while the sale of tickets was on, he was at the same time engaged in a room across the hall from the box office in arranging the advertising, etc., and when there was a call for tickets he would go across to the box office, sell the tickets and then return to his work in the room across the hall. There were numerous other persons about there, but no evidence that any other person than defendant and Henry had access to the money drawer. There was a lock on the door to the box office, but no evidence tending to show whether it was kept locked when defendant was out, or not. When defendant did not return, Henry says he made a casual count of the money in the drawer, examined the tickets and concluded the money was not all there. There was about $600 there. Henry continued the sale of tickets, and that night when the show was over he says he counted the money and compared the stubs of the tickets found in the box at the door with the money in the drawer, and found the money was short $142.50. The prices at which the different tickets were to be sold were not placed on the tickets or stubs.

Henry testified, over the objection of defendant, that at the time, December 5th, he made an entry in his account-book

of the tickets sold, from the stubs in the box, for the "Floro-dora Show," which he testified to be as follows:

| | |
|---|---:|
| 10 seats at $2.00 each | $ 20.00 |
| 325 seats at $1.50 each | 487.50 |
| 193 seats at $1.00 each | 193.00 |
| 48 box seats at $1.00 each | 48.00 |
| 247 balcony circle seats at $.75 each | 185.25 |
| 215 gallery seats at $.50 each | 107.50 |
| 7 admissions at $.50 each | 3.50 |

—making a total of.....................$1044.75

The amount of money in the till or money drawer was then but $902.25. Different prices were indicated by different colored tickets. Both the unsold tickets and the stubs which Henry says he counted in the box at the door of the theater, he destroyed at the end of the performance when he had made the count. He also testified from an entry in a book that he paid the "Florodora Co." $835.80, eighty per cent of $1,044.75.

The foregoing is the evidence, and the only evidence, so far as can be learned from the transcript, by which it was sought to show that defendant collected and had in his possession from the sale of those tickets the sum of $1,044.75, and the only evidence tending to show that he appropriated $142.50 of it. In order to make out a case of embezzlement of property by an agent, four things must concur, and each must be proven beyond a reasonable doubt: 1. That the defendant was such agent; this fact is admitted in this case; 2. That the property charged to have been embezzled must have come into the hands of the defendant as the property of his employer; 3. That he received it in the course of his employment; and 4. That he appropriated it to his own use with intent to steal it. (Pen. Code, secs. 506, 508; *Ex parte Hadley,* 31 Cal. 108; *People* v. *Gordon,* 133 Cal. 538, [85 Am. St. Rep. 174, 65 Pac. 746]; 10 Am. & Eng. Ency. of Law, 2d ed., 983; *Pullan* v. *State,* 78 Cal. 31, [56 Am. Rep. 21].) The money received for the sale of tickets was to be distributed as follows: Eighty per cent of the gross receipts to the Florodora Company and twenty per cent of the gross receipts to be retained by Hall, and, until this division was made, the whole of the proceeds of the sale of tickets would be the property of Hall, and, therefore, if defendant received the money he

is charged with embezzling, it was the property of Hall as charged so far as the purposes of this case are concerned. The first question then, is, Did defendant receive the $142.50? As has been seen there is no direct or positive evidence that he did, and we are simply left to infer he did because he sold tickets at the prices at which they were to be sold and put the money he received therefrom in the money drawer; that Henry found about $600 in the drawer when he took charge, and the evidence of Henry that when he counted the money when the ticket office closed there was $902.25 in the drawer and that when he counted the stubs he found there should have been $1,044.75 there.

The tickets were sold at various prices for seats in different parts of the theater, so that to know the aggregate of money which should have been taken in it would be necessary to know just how many tickets of each kind were sold. This could be ascertained in only two ways: First, to know just the number of tickets of each kind in the rack when the selling began and then count what remained after the selling closed; and, second, to count the stubs of each kind of ticket found in the box at the door of the theater and in each case taking into account passes issued. Henry testified that he concluded there was about $600 in the cash drawer when he commenced selling tickets the afternoon of the 5th, and no accurate count was made until the ticket selling had closed that evening. He then testified, over the objection of defendant, from a memorandum he says he made at the time, that counting the tickets unsold and the stubs in the box, there should have been $1,044.75 in the cash drawer when in fact there was but $902.25. He further says that immediately upon making the count and settling with the show people, he destroyed the stubs and the unsold tickets. Henry says he could not tell how much money was in the till that night when he came to settle with the show people without referring to his memorandum. Under all the circumstances shown in this case, we say it was error to permit Henry to testify from his memorandum. He and defendant were both the agents of Hall, both had sold tickets for that same show that day and all the money both received should have been in the drawer. Defendant testified that he put in the money drawer all the money he received from the sale of tickets, and by the evidence he had previously borne a good reputation. Henry

continued to sell tickets that afternoon, but he does not pretend to say he put all the money he received into the money drawer. Having destroyed the only evidence by which it could be ascertained how much money there should have been in the money drawer, if all the money to represent the tickets sold had gone into the money drawer, and he being equally liable with defendant for this money, he should not have been permitted to testify from the memorandum made by him even though made at the time, for, under the circumstances, it is no more nor less than a self-serving declaration. To further strengthen Henry's position that defendant stole the $142.50, he testifies, over defendant's objection, from what he says is the receipt of the Florodora Company's manager for $835,80, which would be eighty per cent of $1,044.75, the amount which he says, from his memorandum, should have been in the money drawer, but the receipt was not put in evidence. The receipt of Henry Elsner, the manager of the Florodora Company, seems from the evidence to have consisted merely in signing his name in a book. This was the kind of evidence denominated hearsay, and the most dangerous to a defendant in a criminal case, who is entitled to be confronted with the witnesses against him that he may cross-examine them. The prosecution deemed it important to show that the Florodora Company had received $835.80, which was eighty per cent of $1,044.75, in order to support the statement in Henry's memorandum that that sum should have been in the money drawer. Henry Elsner, for aught that appears, might have been brought into court to have testified.

There is absolutely no evidence tending to show that the defendant ever received more money for the sale of tickets than he left with Henry, except what may be inferred from Henry's memorandum and from what he says is Henry Elsner's receipt, and the evidence based upon these two instruments should have been excluded. It is true that after the cross-examination of Henry and the prosecution took him for redirect examination, he testified that he destroyed the stubs and unsold tickets because it was the custom to do so and that he did not know they would ever be needed. But if there was a shortage in the money he knew it and had also suspected defendant of stealing it. From these facts and the **further fact that having the same opportunity of taking**

the money as defendant had, he would most naturally have saved the evidence by which the crime might have been fastened upon defendant, the errors here pointed out, we think, entitle the defendant to a new trial.

The following testimony was given for and against the theory that the defendant fled: Henry testified that when he came to the ticket office between 12 and 1 o'clock of December 5th, defendant was there and that defendant said nothing about quitting, but soon put on his coat and went out. Not returning by the middle of the afternoon, he made inquiry for defendant and got no information as to where he was. Then Henry counted the money and concluded the money was not all there. He telephoned for defendant and remained in the office till 6 o'clock. At that time the defendant had four or five days' wages due him at $50 per month. When Henry did not find the defendant after inquiring at the newspaper offices, his hotel and his usual haunts, some time that afternoon he reported to the police. Defendant testified that when he left the ticket office the afternoon of December 5th, he went to his hotel, laid down a half hour, then walked around town and finally took the afternoon train for San Francisco, and did not know he was wanted by anyone and never knew until his arrest that the officers were looking for him. He remained in San Francisco a few days and went to Petaluma, where he remained for two months, and then went to Camp Meeker and remained in that vicinity—except a few times when he went to the city—until his arrest in July, 1905. During all this time he went by the name of George Hemple, met and talked with officers from San Francisco, and people from Stockton, and knew all the officers and constables about the places he frequented, knew the sheriff of Sonoma county, with whom he did business. That the reason he quit his employers in the unceremonious manner he did was that he had had words with Henry about his salary; that he wanted $75 a month and had been informed he would not get that, and had then told Henry he would quit, and thereupon left. There seems to have been no concealment or attempt on the part of the defendant to keep out of the way of the officers, and we do not think there was sufficient evidence of his fleeing from the place where the crime is alleged to have been committed, or that he attempted to conceal himself to prevent arrest. But

as there was some evidence tending to show flight, the jury is left to determine the weight.

The court gave eight instructions of its own motion. Defendant assigns as error all of these. We have read these instructions over and see no error in any of them. It is the duty of counsel to point out the specific instruction which he believes does not state the law, so that the appellate court may properly test the same.

The next error assigned is, that the defendant requested two instructions, which the court modified and then gave. The first was as follows: "To warrant a conviction of the defendant the prosecution must prove *so clearly and conclusively to your minds,* not only that the defendant actually received the sum of $142.50 in cash over and above the sum left in the drawer at the theater, but that he thereafter feloniously, etc."

The court cut out the words *italicized* in the above instruction, and inserted instead the words "beyond all reasonable doubt."

In the other, the language offered was as follows: "To warrant a conviction of the defendant, he must be proved to be guilty *so clearly and conclusively that there is no reasonable theory upon which he can be innocent when all the evidence in the case is considered together.*"

The words italicized were stricken out and the following inserted in their stead: "beyond all reasonable doubt."

In both of these instructions as the court modified the language, the jury was plainly informed that if the defendant was guilty the proof must satisfy their minds beyond all reasonable doubt of his guilt or he was entitled to a verdict of acquittal, and it seems to us the language tendered by the defendant could have no greater weight or significance. It amounts to but a choice of words in expressing the same thing. We see no error in this. However, the court should give an instruction requested by a defendant which clearly expresses the law, in the language asked.

The court refused the following instruction which is assigned as error: "I instruct you the defendant George Hemple is the only person on trial before you for this alleged offense, and that if you find from a consideration of all the evidence that it points as clearly to some other person, as the person who committed the crime in question as it does to the

4 Cal. App.—9

defendant, or if, after a fair and full consideration of all the evidence the jury entertain a reasonable doubt as to whether the said George Hemple or some other person is the guilty party, then it is your duty to acquit the defendant.''

A defendant is entitled to have an instruction given when it announces the law, responsive to every element of his defense shown by the evidence. The defendant testified to circumstances and facts that stand undisputed which showed that other persons than himself had opportunities of—in one instance taking money from the till, and in another—committing the crime of embezzling the same. On the fifth day of December, while selling tickets at the ticket office, he was also engaged in doing other work in another room across the entrance from the ticket window. This evidence was offered for no other purpose than to show that while defendant was attending to other duties away from the drawer where the money was kept, others had at least the opportunity, however slight, of "tapping the till" and stealing the money. Then, again, the witness Henry who had testified to having discovered the shortage had the same opportunity to appropriate the $142.50 as did defendant. He was but an agent of Hall himself, and handling Hall's money. The defendant proved a good character and had testified that he sold the tickets at the proper prices and put all the money received in the money drawer and that so far as he knew, it was all there when Henry took charge. I think that under the facts appearing in this case, this instruction should have been given, and it was prejudicial error to have refused it.

There are many errors assigned relating to the rulings of the court upon the admissibility of evidence, but seeing no prejudicial error in any not referred to here, we will not set them forth.

The order and judgment are reversed.

Chipman, P. J., concurred.

McLaughlin, J., concurred in the judgment.