[Criminal No. 472.　Filed February 25, 1920.]

[187 Pac. 581.]

## JUAN APODACA and FELIX GRIEGO, Appellants, v. STATE, Respondent.

1. CRIMINAL LAW—REFUSAL TO INSTRUCT TO ACQUIT IF REASONABLE DOUBT AS TO WHETHER DEFENDANT OR SOME OTHER PERSON WAS GUILTY IS ERROR.—In a murder prosecution against two soldiers for killing a dealer in intoxicating liquors in a house of ill repute conducted by a colored woman who claimed to be the only eyewitness, the crime being denied by defendants, it was error to refuse to instruct that, if the evidence pointed as clearly to some other person or persons as having committed the crime as to defendants, or if there was a reasonable doubt as to whether defendants or some other persons were guilty, defendants should be acquitted, notwithstanding other instructions given.

---

1. For authorities discussing various phases of instructions on question of reasonable doubt, see note in 48 Am. St. Rep. 566.

2. CRIMINAL LAW—REFUSAL TO INSTRUCT THAT GOOD CHARACTER MAY
   RAISE REASONABLE DOUBT IS ERROR.—It likewise was error to re-
   fuse to instruct that proof of good character in connection with all
   the other evidence may generate a reasonable doubt which entitles
   defendants to acquittal, even though without such proof of good
   character the jury would convict, notwithstanding other instructions
   given.

APPEAL from a judgment of the Superior Court
of the County of Yavapai. John J. Sweeney, Judge.
Reversed and remanded.

Messrs. Favour & Cornick, for Appellants.

Mr. Wiley E. Jones, Attorney General, Mr. Clyde
M. Gandy, Mr. Louis B. Whitney, Mr. Alexander B.
Baker and Mr. F. J. K. McBride, Assistant Attor-
neys General, for the State.

CUNNINGHAM, C. J.—The appellants are sol-
diers. Prior to December, 1918, they were stationed
at Whipple Barracks, an army post adjoining Pres-
cott. At about said date the duties assigned to them
were what is known as "kitchen police." About
3 o'clock in the afternoon of the last Sunday in De-
cember, 1918 (December 29th), these appellants went
from the post to the city of Prescott and returned to
the post at 10:30 the same evening. On that night,
December 29, 1918, Manuel Gonzales was killed by
having been beaten to death with blunt instruments.
The homicide was committed at the house of a col-
ored woman, Nellie Campbell, the place being one of
ill repute. The body of Gonzales was thrown into a
shed or coal-house on the rear of the Nellie Campbell
lot. On the night of the said 29th of December the
defendants visited the Nellie Campbell house. While
they were there a fight occurred in the house between
Apodaca and Manuel Baca, another soldier of the
post. Griego also participated in the fight, either as
helping Apodaca or in trying to separate the two.

Baca was bruised and his head was cut, his wounds bleeding profusely. His wounds were treated at the post.

The defendants reached the post shortly after Baca got there, and they were present and assisted in dressing Baca's wounds. During the fight in which Baca took part the furniture in the house was disarranged. A dispute exists with regard to whether or not the deceased, Gonzales, participated in the fight. Nellie Campbell made irreconcilable, conflicting statements at different times as to the time of night the fight took place at her house. On the trial she fixed the time at 8 P. M. At the inquest on the body of Gonzales she fixed the time at midnight or a little later, and at another occasion she fixed the time at a different, intermediate hour.

I shall briefly set forth the testimony for the purpose of considering the instructions requested and refused.

Nellie Campbell testified that the fight started between Apodaca and Gonzales over a charge that Gonzales had taken money from Apodaca's pocket while Apodaca was in a drunken stupor, lying on a bed; that, when the fight started, defendant Griego came to Apodaca's assistance against Gonzales. Thereupon Baca attempted to stop the fight. He was hit over the head with a slop jar, withdrew from the fight, and left the house. This witness testifies that the lamp was knocked over at the beginning of the fight; that the defendants forced Gonzales from the front room, where the fight started, into the back room, thence to the back yard; that they used a broom and a hammer and a club with which to strike and beat him, and they kicked him with their heavy shoes. When he ceased to fight in the back yard, after the defendants beat him, they took up the body and threw it in the shed. Witness saw the fight in

the back yard while looking through a hole in the fence. When the body had been disposed of, the defendants left through the front door. The witness also left and went to her mother's house. She stopped for a short time outside of a saloon on the way home, met the defendants at the creek, and arrived at her mother's house a little after 1 o'clock, or a little after 10:30 P. M., according to her conflicting statements.

The defendants positively deny that Gonzales was at the Nellie Campbell house while they were there. They testify that Apodaca and Baca fought at the Nellie Campbell house, that Griego separated them, and they deny that any person participated in a fight with them other than Baca. They deny that they ever heard of Gonzales until they were charged with his death. It is undisputed that they "checked in" at the post before 11 o'clock December 29th.

It is conceded that the three soldiers and Nellie Campbell indulged in drinking intoxicating liquor of some kind prior to the fight between Apodaca and Baca. The facts are clearly established by the evidence that snow began to fall about 11 o'clock on the night in question, and on the morning following the ground was covered with snow to a depth of four or more inches; that the frozen body of Gonzales was found in the shed after Nellie Campbell had reported to the local authorities of its being there. A broom, a hammer, a club and other instruments were found in the rooms and in the back yard, all of which instruments appeared to have blood on them. The rooms gave evidence of a fierce struggle, and much blood was about the furniture and on the floor.

The body of Gonzales was clad only in underclothes, and shoes were on the feet; the trousers were about the feet. The skull was literally crushed, and the body was bruised and lacerated in a great many

places. After the snow melted patches that seemed
to be blood stains were observed in the back yard,
and a bloody sweater with snow on it was found in
a cellar under the Nellie Campbell house. Witnesses
who lived about fifty or seventy-five yards from the
Campbell house heard a shot at that house on the
night of December 29th about midnight, and saw a
number of persons who seemed to be Mexicans about
the front of the Nellie Campbell house, acting in an
excited manner. Gonzales was engaged in the busi-
ness of disposing of intoxicating liquors—in the busi-
ness commonly known as "bootlegging."

The appellants denied that they ever saw Gon-
zales; denied that he participated in any fight with
them or with either of them; explained the circum-
stances of their visit at the Nellie Campbell house,
the camera that they left there, the blood stains
found on their clothes, and all other circumstances
tending to connect them or either of them with the
Gonzales killing. They introduced testimony estab-
lishing their good character, and such good character
is not disputed. With the exception of the testimony
of Nellie Campbell, who claimed to have witnessed
the homicide, all of the testimony and circumstances
point with equal certainty to others as they point to
the defendants as the criminals. The defendants'
testimony and the evidence furnished by physical
facts with other testimony are consistent with the de-
fendants' innocence and contradict Nellie Campbell's
testimony to the effect that she saw the defendants
kill Gonzales.

From all of the testimony, as this record presents
it to us, the whole question on the trial turned on the
inquiry whether or not the appellants were actually
present and killed Gonzales. The testimony of an
eye-witness, as such witness claims to have been, was
squarely met by the denials of the two defendants,

corroborated in great detail by many facts and circumstances. Nellie Campbell attempts to explain the evidence of a bullet hole in her door as having been made on Christmas day about noon by one Lee Overton, a jealous lover, at a time when others were present, including Louis Barbar, and she denied that a shot was fired in her house on the night of December 29th.

The defendants were convicted of manslaughter, and they have assigned a great number of errors alleged to have been committed at the trial. We shall not discuss all of these assignments, as a large number of them have no application to a charge of manslaughter, but apply only to murder charges.

We will consider the assignments alleging error upon the grounds that the court refused instructions No. 12 and No. 20, requested in writing by the defendants.

Request No. 12 is as follows:

"The court instructs the jury that the defendants, Griego, and Apodaca, are the only persons on trial before you for this alleged offense, and that if you find from a consideration of all the evidence that it points as clearly to some other person or persons as having committed the crime in question as it does to the defendants, or if, after a fair and full consideration of all the evidence, the jury entertain a reasonable doubt as to whether the said defendants or some other persons are the guilty parties, then it is your duty to acquit the defendants."

An instruction to the same effect and almost in the identical words was refused in *People* v. *Hemple,* 4 Cal. App. 120, 130, 87 Pac. 227, 231. The court of appeals of California there said:

"A defendant is entitled to have an instruction given when it announces the law responsive to every element of his defense shown by the evidence. The defendant testified to circumstances and facts that stand undisputed which showed that other persons

than himself had opportunities of . . . committing the crime. . . . I think that under the facts appearing in this case this instruction should have been given, and it was prejudicial error to have refused it.''

The facts in the case at hand present a more telling call for such instruction to be given than is shown in the opinion in the *Hemple case, supra.*

Request No. 20, also refused, is as follows:

''The court instructs the jury that proof of good character in connection with all the other evidence may generate a reasonable doubt, which entitles the defendants to an acquittal, even though without such proof of good character the jury would convict.''

This is a near copy of an instruction refused and assigned as error in *Bryant* v. *State,* 116 Ala. 446, 23 South. 40. The same had been theretofore approved by the Supreme Court in *Newsom* v. *State,* 107 Ala. 133, 18 South. 206, and in *Goldsmith's case,* 105 Ala. 9, 16 South. 933. The ruling was again recognized as correct in *Taylor* v. *State,* 149 Ala. 32, 42 South. 996.

Early in the Alabama court the law on this subject was stated in the case of *Felix* v. *State,* 18 Ala. 720. The court adopted as the correct rule the following from Roscoe's Criminal Evidence (1846 ed.), 97, as follows:

''That the good character of the party accused, satisfactorily established by competent witnesses is an ingredient which ought always to be submitted to the consideration of the jury, together with the other facts and circumstances of the case. The nature of the charge and the evidence by which it is supported will often render such ingredient of little or no avail; but the more correct course seems to be, not in any case to withdraw it from consideration, but to leave the jury to form their conclusion upon the whole of the evidence whether an individual whose character was previously unblemished, has or has not com-

mitted the particular crime for which he is called upon to answer.''

The court says, following the quotation from Roscoe:

''We think this places the rule upon sensible and intelligible ground, and we feel no hesitation in adopting it.''

There are cases where the testimony adduced for and against the accused is nearly balanced in which good character may be very important to a man's defense. He may show that, notwithstanding suspicious circumstances tending to connect him with the commission of an offense, he is of perfectly good character in the neighborhood in which he resides and where he is known, and that may be sufficient to exonerate him.

The respondent contends that the instructions of the court covered fully the rule laid down in request No. 20, and for that reason the refusal of such request did not prejudice the defendants. The court instructed the jury that they should take evidence of good reputation into consideration with all the other evidence

''in determining the question of the guilt or innocence of the defendants, or the degree of guilt, if he should be guilty of any degree of the offense charged in the information. Good reputation is not a defense of a charge of crime. If one is actually [guilty] of the commission of a crime, the fact that he has a good reputation is no justification or excuse for the killing, but it is evidence to be considered by you for determining whether or not he is guilty of the crime charged in the information or of any degree of that crime.''

This instruction has nothing to recommend it. It is confusing, and leaves evidence of good reputation of no weight in cases where one is ''actually guilty of the commission of a crime.'' This confused in-

struction makes the giving of request No. 20 the more imperative.

The following was given on this subject: The court called attention to the fact that the defendants had introduced evidence "tending to show their good character for peace and quiet." The Attorney General argues that this charge covers request No. 20. The court instructs:

"If the evidence convinces you beyond a reasonable doubt of defendants' guilt, you should so find, notwithstanding their good character in that behalf; but if, in the present case, the good character of the defendants for peace and quietness is proven to your satisfaction, then such facts are to be kept in view by you in connection with all the other evidence in the case in all your deliberations, and if, after a consideration of all the evidence in the case, including that bearing upon the good character of the defendants, the jury entertains a reasonable doubt as to the defendants' guilt, then I charge you that it is your duty to find the defendants not guilty."

This instruction seems to intend to throw the evidence of good character into the scales on the side of the prosecution; "if, after a consideration of all the evidence in the case, . . . [still] the jury entertains a reasonable doubt," they must acquit; if, after having considered the evidence of good character, they entertain a reasonable doubt. The instruction certainly does not inform the jury that good character in connection with all the other testimony may generate a reasonable doubt, and therefore entitle the defendants to an acquittal.

The instructions given on the subject of good character do not correctly state the law on that subject, and are calculated to confuse the jury. The instruction refused does state the correct rule, and the evidence in this case presents a contingency for the application of the rule and the giving of such instruction.

· Upon the whole record, in view of the unsatisfactory state of the evidence, the judgment of conviction must be reversed, and the cause remanded for a new trial. It is not our purpose to notice other alleged errors, because upon another trial such errors, if any, will be avoided.

Reversed and remanded.

ROSS and BAKER, JJ., concur.