[Crim. No. 4470. Second Dist., Div. Three. Dec. 8, 1950.]

THE PEOPLE, Respondent, v. CARL WILLIAM
CROWLEY, Appellant.

John J. Hamilton for Appellant.

Fred N. Howser, Attorney General, and Donald D. Stoker, Deputy Attorney General, for Respondent.

SHINN, P. J.—The defendant, Carl William Crowley, was accused of the crime of burglary in that he did enter a certain building with the intent to commit theft. The defendant had been convicted of five prior offenses (two violations of Veh.

Code § 146; one violation of the Narcotic & Drug Act; one conviction for forgery; one violation of Health & Saf. Code, § 11160.) Defendant pleaded not guilty.

Elmo Vincent, a witness for the People, testified that he had an apartment across the hall from the office in question which was used by his brother, Dr. A. H. Vincent, and that he and another brother were watching (listening to) television on Sunday night, December 4th, when they heard what he described as a "tremendous noise" going on in the office across the hall. Mr. Vincent told his wife to call the police while he and the brother went across the hall to investigate. He testified that they found the door into the office reception room ajar about one inch, that he switched on the lights and while they were standing there a man came walking out of the treatment room in the rear into the room in which they were standing. The brother, who was not called as a witness, asked the man (who remains unidentified), according to the witness, what he was doing there and the stranger told him he was looking for the doctor. Vincent testified that the stranger looked quite ill, that he was staggering, and that he showed the brother a letter which said that although it might appear that the bearer was intoxicated that he was not—that he was a very sick man. Vincent did not see the letter closely enough to read it, and did not know whether it was typewritten, printed or written in longhand. The stranger did not tell Vincent or his brother about anyone escorting him to the office, and after the brother had seen the letter, the two men allowed the man to leave. The brothers then turned out the light in the waiting room, closed the door and, after making certain it was locked, returned to the apartment across the hall.

The record shows without conflict that two groups of police officers arrived at the scene—one group within two or three minutes after the brothers had questioned the stranger and that these officers set out immediately to search the neighborhood without going into the office. The second group arrived approximately 30 minutes later and, with the two brothers, went into the office. During the search, the defendant was discovered crouching with his shoes in one hand in one of the smaller treatment rooms behind the treatment table. In this room was a cabinet in which various narcotics were kept, but there was no evidence that any of the drugs had been taken although the doors which normally were kept closed but unlocked, were open as were several of the drawers. One of the

police officers testified that he had searched the defendant but had found no drugs or burglar's tools on his person, and that he had found only a wallet, a key, and a small pencil type flashlight.

The defendant, testifying in his own behalf, stated that earlier that evening he had been filling his tray at a Simons cafeteria in downtown Los Angeles, and that he had helped an old shaky man who was having trouble. He said that the old man showed him a letter, written in longhand, which explained that he was ill and not intoxicated. During the conversation which ensued, apparently the defendant offered to go with him to a doctor's office on Vermont Avenue. When they arrived, according to the defendant's testimony, the door was unlocked and they went into the waiting room; they thought the doctor was in the back because there was a light back there. This was corroborated by Vincent's testimony that the street lights, shining through a back window, partially illuminated the treatment room. The defendant stated that after they had waited about 15 minutes he suggested to the old man that he make himself known and the stranger then knocked on the partition. While the two were in the treatment room where they discovered the light was from the street, they heard someone come into the waiting room. Defendant testified that the old man said for him to wait there, that it was probably the doctor and that the old man then walked into the waiting room; that he heard the conversation with the brothers and heard the old man leave; that he then heard the police running up the stairs, and because he was afraid of losing his parole, took off his loose shoes, tiptoed back into the treatment room and hid behind the table where he was later found by the second group of officers. Defendant testified without conflict that although he had been an addict he had not used narcotics for four years and the record is devoid of evidence to show that he was at the time of arrest under the influence of any drug. He stated that he had only gone to the office to help the old man and that he had not stolen anything, nor had he intended to do so.

The only point raised on the appeal is that the court committed prejudicial error in making certain remarks to the jury after it had reported inability to agree. The record shows that the jury retired at 12 noon, returned to the courtroom at 4:22 and stated that it was unable to reach a verdict, and that the trial judge without information as to the manner

in which the jurors were divided made the following statement: "Very well. Ladies and gentlemen 'of the jury, you have indicated to me that you are unable to agree up to this point. You are therefore instructed that evidence has been brought here before you jurors and I feel that the evidence produced in this case has been *plain and clear*. It is true, of course, that there has been *some conflict in the evidence*, but I do not see anything in the evidence of such a nature as to make it impossible for you as jurors to agree one way or the other. The Court is not attempting to tell you or even suggest to you how you should decide the matter but, as I say, the *evidence is clear*, although conflicting. It is subject to be analyzed by the jurors. As long as there is *no conflict* or misunderstanding as to what the evidence is, it appears to the Court that it should be analyzed to the extent of being able to reach a decision in the case. It is of importance to both plaintiff and the defendant, or to the People and the defendant, that a decision be reached; when *a decision* is not reached, and a cause terminates, it means *considerable expense to the County and to the defendant*. Of course, this is a secondary matter. The matter of determining the charge as presented to you for determination by the evidence and the instructions are of first and paramount importance, but at the same time *when it comes to the matter of trying cases over, more than once, it means that there is an additional burden both on the People of the State and the defendant*. You are instructed that you have no right to decide this case on surmise or suspicion, as I have previously indicated in my instructions. Your oath as jurors is to the effect that you determine this case solely and only upon the evidence legally introduced and the law as given to you by me in my instructions. The Court feels that you should by honest endeavor and by exerting every reasonable means within your power of reasoning, reach a verdict in this case, *if it is at all possible*. I am going to have you retire again and see if you cannot come to some kind of a decision. You will therefore retire to the jury room for further deliberation. If you are unable to reach a verdict by 5:00 p. m. on this date, Mr. Bailiff, you will—Mr. Foreman, if you are unable to reach a verdict by 5:00 o'clock, you will so inform the bailiff. In such event, Mr. Sheriff, you are ordered *to lock the jury up for the night and return the jury to this court room at 9:30 tomorrow morning, February the 1st. . . .* Very well, Mr. Clerk, in the event the jury should not reach a verdict by 5:00 o'clock and it is necessary for them to be .

locked up for the night, we will at this time swear in a woman bailiff and in the event it is necessary for the jury to be locked up, you will swear in the other bailiff to take charge of the jury. (The clerk swore in the woman bailiff.) THE COURT: The jury may now retire.''

After these proceedings, the jury returned to the jury room at 4:29 p. m. and returned into court at 5 p. m. with a verdict finding the defendant guilty of second degree burglary.

■ It is well settled that a conviction will not be allowed to stand if the court has made remarks to the jurors which might reasonably be interpreted as indicating the court's belief of the guilt of the accused, and if it also appears upon the entire record that the infringement upon the rights of the defendant resulted in a miscarriage of justice. Under our system of law no reviewing court could hold otherwise. These questions must be answered on the factual basis of the individual case.

The courts have not hesitated to reverse convictions where trial judges have urged that an agreement be reached after learning that a small minority of the jurors were holding out for acquittal. (*People* v. *Walker,* 93 Cal.App.2d 818 [209 P. 2d 834] ; *People* v. *Blackwell,* 81 Cal.App. 417 [253 P. 964] ; *People* v. *Piscitella,* 90 Cal.App. 528 [266 P. 349] ; *People* v. *Talkington,* 8 Cal.App.2d 75 [47 P.2d 368] [Reviewing state and federal authorities].) It is manifestly true that insistence upon an agreement with knowledge that the jurors favoring acquittal constitute a small minority, is an indication of the court's belief that the verdict should be against the accused. The jurors would naturally suppose the court's remarks to be addressed to those who were in the minority. As stated in, *People* v. *Walker, supra,* when the court gains information as to how the jurors are divided greater care should be exercised in order that the court's remarks may not be taken as an indication that the verdict should be one way or the other. However, the forbidden result can be accomplished without its having been disclosed how the jurors are divided upon the question of guilt. The jurors know how they are divided and the minority, especially if few in number, would be the ones to feel the weight of the pressure.

■ The present case is clearly one in which the court's remarks must be deemed prejudicial. The court stated: ''You are therefore instructed that evidence has been brought here before you jurors and I feel that the evidence produced in

this case has been *plain and clear* . . . as I say the evidence is *clear although conflicting* . . . it appears to the court that it should be analyzed to the extent of being able to reach a decision in the case." The jurors were told that they should reach a verdict *"if it is at all possible."* These statements meant that the court was of the opinion that although there was conflicting evidence either that upon which the People relied, or the testimony of the defendant was unworthy of belief and should be rejected or, in other words, that there was no basis in the evidence for a reasonable difference of opinion as to the guilt of the defendant. Reasonably intelligent jurors would know that the court would not permit a defendant to be convicted upon legally insufficient evidence and would have understood that the court in the present case was not impressed by the weakness of the evidence of the People. Since they were not advised to acquit the defendant they could reasonably have inferred that the court expected them to convict him. Any question as to the interpretation that was placed upon the court's remarks finds an answer in the verdict of guilty which was rendered some 30 minutes later. (See *Wissel* v. *United States* (C.C.A. 1927), 22 F.2d 468,·470; *Wade* v. *State,* 155 Miss. 648 [124 So. 803, 85 A.L.R. 1406]; *Peterson* v. *United States* (1914), 213 F. 920, 926 [130 C.C.A. 398]; *Edwards* v. *United States* (C.C.A. 8th 1925), 7 F.2d 598, 603; *Meadows* v. *State,* 182 Ala. 51 [62 So. 737, Ann.Cas. 1915D 663]; *Gidley* v. *State,* 19 Ala.App. 113 [95 So. 330, 331]; *State* v. *Pierce,* 178 Iowa 417 [159 N.W. 1050, 1054]; *Kelly* v. *State,* 33 Tex.Crim.Rep. 31 [24 S.W. 295, 297].)

In *People* v. *Conboy,* 15 Cal.App. 97 [113 P. 703], after the jury had deliberated seven and one-half hours and applied for further instructions which were given, the court said: "Now gentlemen I think I have read to you about all the instructions you desire upon these points, now, gentlemen, and I suggest to you that there is no reason why twelve, honest, intelligent, reasonable men should not reach a conclusion in this case, and I am surprised that you have not done so already. All I want to say to you that you consider the evidence offered and admitted here and the law as given you by the court, and decide this case upon that, and not upon any personal observations, relations or experience that any of you have had. Now, go out and do your duty."

In *People* v. *Carder,* 31 Cal.App. 355 [160 P. 686], the jury had been deliberating overnight and having been returned

into court, reporting their inability to agree, were addressed by the court as follows: "How many contrary ones are there?" Juryman: "Two." The Court: "Well, I tell you, gentlemen, . . . Questions of fact you must decide; there oughn't to be any trouble. It's a case you ought to decide, ought to agree upon and don't make up your minds that you can't agree, don't get contrary but just in a good humor, good-natured way work it out. . . . Well, go back and go to work gentlemen. The court will be here any time when you agree."

In *People* v. *Blackwell*, 81 Cal.App. 417 [253 P. 964], the jury had been deliberating for about three hours, and stood nine to three for conviction. The court stated: "You have heard the evidence here and you all understand all of the evidence. I think the jury ought to agree on a verdict. I think you better retire and deliberate further."

In *People* v. *Kindleberger*, 100 Cal. 367 [34 P. 852], the jury had been out from 9 o'clock in the evening until 10 o'clock the following morning, when they reported a disagreement. Whereupon, the court stated: ". . . in view of the testimony in this case the court is utterly at a loss to know why twelve honest men cannot agree in this case . . . ." And after admonishing the jury "to sift and digest the testimony carefully and conscientiously, and not stubbornly to express an ill-digested opinion and stick to it" stated: "I repeat, gentlemen, that I see no reason on earth why a jury in this case, upon this testimony, cannot agree."

In these cases judgments of conviction were reversed for the reason that the juries may have been influenced by the remarks of the court to return verdicts of guilty.

 The opinion in *People* v. *Kindleberger, supra,* prepared by Justice DeHaven, contains a statement of the law which is applicable to the present case and which we wish to adopt as our own. The court said (p. 369): "When upon the trial of a defendant the evidence is clearly insufficient to justify a verdict of guilty, it is the duty of the judge to so inform the jury, and to advise a verdict of acquittal. This power is sometimes exercised by courts, and is one so frequently invoked in the trial of criminal cases that its existence may be regarded as a matter of common knowledge upon the part of jurors of ordinary intelligence and experience, and this fact is not to be lost sight of in considering the impression likely to have been made upon the jury by the charge of the judge in this case. To any one knowing that it is the duty of the court to advise an acquittal, if the

evidence is such, that, in the opinion of the judge, twelve honest men would have no right to convict him, the remarks of the judge in this case could not fail to creat the impression that he thought the jury ought to convict upon the evidence before them. But it is not necessary that we should be able to say that the jury must have so understood the charge. Unless it appears that it could not have been so understood we cannot say that the charge was without prejudice to the defendant. The court has no right, except when advising an acquittal, to give any expression of its opinion as to the weight of evidence, or to tell the jury that the evidence is so clear that they as honest men ought not to disagree, which is in effect the same as telling them that there is no conflict in the evidence, and that as honest men they can render but one verdict. In a subsequent part of the charge the learned judge did inform the jury that they were the sole judges of all questions of fact and of the credibility of the witnesses, and that the court had no right to trench upon their province in this respect; but the error already noticed in the previous part of the charge was not cured by this subsequent statement. The fact still remained impressed upon the minds of the jurors that it was the opinion of the judge that there ought to be no disagreement, and that the testimony would justify but one verdict."

In *People* v. *Walker, supra,* 93 Cal.App.2d 818 [209 P.2d 834], the court reviewed numerous criminal cases in which the claim was made that the trial courts in urging jurors to reach a verdict had expressed themselves in a manner which indicated belief that a verdict of guilty should be returned. It was then said (p. 825): "While most of the cases upon the subject were before the enactment of section $4\frac{1}{2}$ of article VI of the Constitution, the rule would appear to be the same now as then, namely, that if, under the circumstances of the particular case, the remarks of the judge, who knew how the jury stood, were such as to bring to bear in some serious degree, although not measurable, an improper influence upon the jury, or to indicate to the jury that a particular result should be reached, such remarks constitute prejudicial error."

Another feature of the proceedings which gave added force to the statements we have discussed is the fact that the jurors were allowed only a half hour to reach a verdict before being locked up for the night. They reported an agreement just in time to escape this result. The fixing of so short a time after the reported disagreement was of itself a form of com-

pulsion and quite contrary to the usual practices of trial judges as we understand them. The hour was not late. Calm and thoughtful consideration of the evidence could have been had in time for the jurors to return to their homes for the night. It is customary for judges to make arrangements for the receipt of verdicts a considerable time after court hours. Such consideration for the convenience of jurors, especially women jurors, is not only due them but tends to make jury service less onerous and therefore more acceptable to citizens who have duties at home which they cannot well neglect. There are, of course, many situations in which jurors must suffer the inconvenience of continuing their deliberations for days at a time. The complexity of the issues may require it. But this is not such a case. The dissenting jurors, if they did not agree with the others in half an hour, would have been responsible not only for their own detention overnight but also for the detention of the other jurors. And we think it would require unusual stamina in one or more dissenting jurors to hold to their minority views against the remainder, who would naturally be somewhat rebellious at the thought of being locked up for the night at 5 o'clock. This phase of the proceedings, as we say, emphasized the pressure which the court's remarks placed upon the minority of the jurors. Clearly these were the ones who had previously deemed the evidence of guilt to be unsatisfactory. We cannot say that they voluntarily changed their opinions. After considering the evidence for several hours they had been unable to agree with their fellow members. Those who believed defendant had not been proven to be a burglar had had an opportunity to hear his testimony and judge of his credibility. We cannot presume that they would have changed their opinions had the questioned proceedings not taken place, and the judgment must therefore be reversed.

The judgment is reversed; the cause is remanded for a new trial.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied December 22, 1950, and respondent's petition for a hearing by the Supreme Court was denied January 5, 1951.