[Crim. No. 4066. First Dist., Div. One. June 25, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM LOUIS MINKOWSKI, Defendant and Appellant.

Leo R. Friedman and Meyer Scher for Defendant and Appellant.

Stanley Mosk, Attorney General, John S. McInerny and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, J.—Defendant was indicted by the grand jury on five separate counts of rape (Pen. Code, § 261), two of which charged violations of subdivision 1 of section 261 ("[w]here the female is under the age of eighteen years") and three of which charged violations of subdivision 5 of section 261 ("[w]here . . . [the female] is at the time unconscious of the nature of the act, and this is known to the accused"). The indictment charged the commission of these acts upon three young women who, for reasons obvious hereafter, will be referred to as Miss X, Miss Y and Mrs. Z. Defendant was charged in count one with statutory rape (§ 261, subd. 1) and in count two with rape (§ 261, subd. 5) committed on Miss X during the week following January 7, 1961; in count three with statutory rape (§ 261, subd. 1) and in count four with rape (§ 261, subd. 5) committed on Miss Y "prior to March 15, 1961, and within three years last past"; and in count five with rape (§ 261, subd. 5) committed upon Mrs. Z on or about February 27, 1961. Each of the five counts charged prior convictions of abortion (Pen. Code, § 274) and conspiracy to commit abortion (Pen. Code, § 182).

Defendant's motion to set aside the indictment (Pen. Code, § 995) was denied. His petition for a writ of prohibition was denied by this court, and his subsequent petition for hearing of such petition by the Supreme Court was also denied.

Since the grand jury testimony disclosed several acts of intercourse as to the three prosecuting witnesses, defendant, at the commencement of the trial moved that the prosecution elect as to which particular act it was relying on. The prosecution thereupon conceded that counts one and two (with Miss X) involved the same act and elected to rely on the first act of intercourse shown to have taken place within the week

following January 7, 1961. In respect to counts three and four (with Miss Y) the prosecution elected to rely on the last act of intercourse shown to have taken place on or about February 2, 1961. On count five (with Mrs. Z) the prosecution stood on the date alleged in the indictment.

A jury found the defendant guilty on count two (Pen. Code, § 261, subd. 5—Miss X) and count five (Pen. Code, § 261, subd. 5—Mrs. Z) but not guilty on counts one, three and four. Defendant's motion for a new trial was denied. His motion for probation was denied and he was sentenced to imprisonment for the term provided by law. He has appealed from the judgment of conviction on counts two and five and from the order denying his motion for a new trial.

Defendant contends here that (1) there being insufficient evidence before the grand jury to establish the corpus delicti independent of his extrajudicial statements, he was indicted without reasonable or probable cause as to counts two and five, and the court was without jurisdiction to try him and erred in denying his motion to set aside the indictment; (2) the court erred in admitting, over defendant's objections, certain testimony of two police officers; (3) as to count two, the evidence failed to establish the act elected and relied on by the prosecution; (4) the court erred in giving and in refusing to give certain instructions; and (5) the verdicts of guilty were coerced. We have concluded that none of the foregoing contentions have merit and that the judgment and the order denying motion for new trial should be affirmed.

The defendant was a physician with offices in Palo Alto, California. On January 7, 1961, Miss X, who was 16 years old, accompanied by her mother went to the defendant's office for the treatment of menstrual cramps. She and her family had known the defendant for about three and one-half years. The two families lived on the same street about three houses apart. The defendant had previously treated Miss X and her parents. The two families also had some social contacts.

Miss X removed her clothing and put on a hospital gown. She then lay on her back on a table with her feet in stirrups while the defendant examined her. No one else was present. The defendant told her that a series of tests were needed to find out what was wrong and clear up the problem.

She returned about a week later for the tests. She had apparently been told it would be a vaginal-smear test. She went into the examination room, removed her clothing and put on a hospital gown. She and the defendant were the only

persons in the room. He told her to lean over a table with her feet spread apart, giving as a reason that it was an easier position for the test. As she did so, the gown would slip off her shoulders. While she was in this position, the defendant used an instrument for a few seconds, and then something else. The first object was cold and "the second time it wasn't at all." The second object "didn't pinch like the first one did. It wasn't as uncomfortable." The second object "kept coming in and out" of her vagina; "[i]t didn't go in and stay like the first one did." During the examination the defendant exercised her breasts, telling her it was necessary to help stimulate the glands. He used both hands doing this, while the second object was being inserted during the second part of the test. Right before the second part of the test and at the end, she thought she heard a zipper. She also felt clothing against the back of her legs during the second part of the test. She estimated that the whole test would last about three minutes.

Miss X returned to the defendant's office for similar examinations on six or eight other occasions. The last one took place on February 20, 1961. During all examinations, except the one on January 7th, defendant pulled back on her hips several times. Several times during these examinations he wiped Miss X off and then wiped up the floor. After the tests he would tell her to go home and be sure to wash off because the test might cause an infection or she might be allergic to it in some way. Several times during the second part of the test, she thought she felt "a throbbing, or something" in the vaginal area.

On Sunday evening, February 19, which was the day before the last examination, the defendant came to Miss X's home and talked to her and her mother about commencing a second series of tests. He first asked if she could come that evening and later made an appointment for her to come in the following evening, February 20. Within a week after the last test, he again went to her house, attempting to have her take another test that night. She told him she had a babysitting job until 9:30 or 10 p.m. and did not go, although he indicated to her it would not be too late at that hour. He also talked to her mother about it. This conversation took place after Miss X had complained to her mother about the defendant's conduct on February 21, the day following the last examination. It was after the last examination that Miss X was sure that the defendant was using himself during the second part of the test.

Mrs. Z was 19 years of age at the time of the events involving the defendant. She was married in January 1961 but at the time of the trial in June 1961 had separated from her husband and was living with her parents. She testified that she went to the defendant for treatment for menstrual cramps on some six to eight occasions, beginning in November 1960 and ending on February 27, 1961. The tests took place about once every two weeks.

On February 27, 1961, the defendant had her undress and put on a white gown. He then had her take a position standing at the examination table, with her legs apart, facing away from him and more or less bent over. This caused the gown to fall open. He first inserted a metal instrument and then an instrument which was somewhat warmer than the first. He then wiped her off and wiped off the floor. During the examination he had one of his hands on her stomach and the other on one of her breasts. He told her that the purpose of this was to stimulate her in a way to activate certain hormones for the vaginal smear. With his hand on her stomach, the defendant pulled her toward him. She felt his pants against her buttocks and heard a zipper. The examination took less than five minutes. The witness told the defendant she was financially unable to continue with the examination, whereupon he answered that it would not cost her anything as he was interested in seeing how her system changed from the last examination. He told her when she got home to douche immediately. Within a short time after she arrived home, he called to ask if she had followed his directions.

Mrs. Z testified that on all previous visits to the defendant in this series of tests the examinations were "roughly—similar. . . ." It was not until the last visit that she suspected anything. On cross-examination she testified that it was on this visit that she could feel the defendant's penis inside of her and "knew that it was him and not an instrument."[1]

Sergeant Philip Ray of the Palo Alto Police Department testified that he and Captain Guy Wathen went to defendant's office on March 1, 1961, with a warrant issued upon a complaint charging defendant with contributing to the delinquency of a minor. Ray testified to the following admissions made by the defendant to the two officers: that after her first examination, the defendant had Miss X stand in the position

---

[1] We do not summarize the testimony of Miss Y which pertained to counts three and four on which defendant was acquitted.

we have described; that he first used on her a proctoscope, an instrument usually used for rectal examinations, because it was shaped like a penis; that after he used the proctoscope, he would insert his penis into the vaginal region; that he used contraceptives on all occasions but the last on February 20th, and was afraid Miss X would become pregnant; that his statement to Miss X's mother that he was consulting with a Stanford doctor on the tests was a lie; that "his problem was sex" and "he had been going to see Dr. Arthur Hardy, a psychiatrist in Menlo Park, and had given him the—the same details that he had told me about his contacts" with Miss X.

Captain Wathen generally corroborated Sergeant Ray. He also testified to the following additional admissions by the defendant: that the defendant had had intercourse with Miss X and had fondled her breasts; that he had also had sexual intercourse with Miss Y and Mrs. Z (at that time the officers had no knowledge of the other patients); that he admitted a penetration without a contraceptive only once as to each of the other girls.

The prosecution called as a witness Dr. Arthur Hardy to whom reference was made in the testimony of the police officers. Upon defendant's objection, the court refused to permit the witness to be examined upon the grounds that the questions called for privileged communications between a psychologist and client. (Bus. & Prof. Code, § 2904.)

The prosecution also called Dr. H. L. Harrison, Jr., an obstetrician and gynecologist, who testified that the position taken by the prosecuting witnesses was not the proper and suitable one for taking vaginal smears; that he was unable to relate the use of smears to menstrual cramps; that he had never heard nor read that the exercise of a woman's breasts was a known medical treatment for menstrual cramps; and that the most commonly used instrument for vaginal examinations is a Gray speculum rather than a proctoscope, which is basically designed for rectal examinations.

The defendant took the stand in his own defense. In view of the issues now raised, we deem it unnecessary to set forth his testimony in detail. It is sufficient to note that the defendant denied the offenses charged in the indictment; that he denied alleged admissions made to the two police officers; and that he explained why he conducted the various examinations and performed the acts incident thereto in the manner we have described above.

*Defendant's motion to set aside the indictment.*

Defendant contends that the trial court erred in denying his motion, made before trial, to set aside counts two and five of the indictment upon the ground that he had been indicted without reasonable or probable cause.[2] Such motion was made on the basis that the evidence presented to the grand jury was insufficient, independent of the extrajudicial admissions of the defendant, to establish the corpus delicti. ■ As we held in *People* v. *Fernandez* (1959) 172 Cal.App.2d 747, 750 [342 P.2d 309], an order denying a motion to set aside an indictment is not directly appealable and is reviewable upon appeal from the judgment of conviction.

■ In *Bompensiero* v. *Superior Court* (1955) 44 Cal.2d 178, 183-184 [281 P.2d 250], it was stated that ''[p]robable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. (*People* v. *Nagle*, 25 Cal.2d 216, 222 [153 P.2d 344].) An indictment will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it. (*Lorenson* v. *Superior Court*, 35 Cal.2d 49, 56, 59 [216 P.2d 859] ; *cf. Greenberg* v. *Superior Court*, 19 Cal.2d 319, 322 [121 P.2d 713].)''

■ Where there is no evidence to connect the defendant with the commission of the crime charged (*Greenberg* v. *Superior Court* (1942) 19 Cal.2d 319, 322 [121 P.2d 713]) or where there is a total absence of evidence to support a necessary element of the crime charged (*McFarland* v. *Superior Court* (1948) 88 Cal.App.2d 153, 159 [198 P.2d 318] ; *Dong Haw* v. *Superior Court* (1947) 81 Cal.App.2d 153 [183 P.2d 724] ; *People* v. *Olf* (1961) 195 Cal.App.2d 97, 102 [15 Cal. Rptr. 390] ; *People* v. *Bartlett* (1962) 199 Cal.App.2d 173, 179 [18 Cal.Rptr. 480]) the indictment is invalid. ■ Such an invalid indictment confers no jurisdiction upon the court to try the accused. (*Greenberg* v. *Superior Court, supra*; *People* v. *Rosborough* (1960) 178 Cal.App.2d 156, 166 [2 Cal.Rptr. 669].)

■ It is a settled rule of law that the corpus delicti must be established independently of the admissions of the defendant. (*People* v. *Cullen* (1951) 37 Cal.2d 614, 624 [234 P.2d 1].) ■ The extrajudicial statements of the accused can-

[2] Defendant so moved as to each of the five counts of the indictment but only the two counts upon which he was convicted are involved here.

not be considered without proof of the corpus delicti by independent evidence. (*People* v. *Schuber* (1945) 71 Cal.App. 2d 773, 774-775 [163 P.2d 498]; *Murphy* v. *Superior Court* (1961) 188 Cal.App.2d 185, 188 [10 Cal.Rptr. 176].)

■ Slight or prima facie proof of the corpus delicti is all that is necessary. (*People* v. *Hudson* (1934) 139 Cal.App. 543, 544 [34 P.2d 741]; *People* v. *Cullen, supra*; *In re Flodstrom* (1954) 134 Cal.App.2d 871, 875 [277 P.2d 101].)

■ The corpus delicti may be proved by circumstantial evidence and the reasonable inferences drawn therefrom. (*People* v. *Ives* (1941) 17 Cal.2d 459, 463 [110 P.2d 408].)

■ The elements of the corpus delicti of the offense defined by subdivision 5 of section 261 are: (1) that an act of sexual intercourse took place; (2) that the victim was not the wife of the perpetrator; (3) that the victim was at the time unconscious of the nature of the act; and (4) that this was known to the accused. In essence, defendant's argument is that no competent evidence before the grand jury supports the first element above-mentioned. Defendant does not, and in our view cannot, urge the insufficiency of proof with respect to the other three elements. Thus we are presented with the narrow question as to whether there is a rational basis for believing that an act of intercourse took place. Under the peculiar facts, such proof and thus proof of the corpus delicti necessarily connects the defendant with the crime.

■ While penetration is an essential ingredient of the offense (*Smith* v. *Superior Court* (1956) 140 Cal.App.2d 862, 863 [295 P.2d 982]) "[a]ny sexual penetration, however slight, is sufficient to complete the crime." (Pen. Code, § 263.)

■ Penetration may be proved by circumstantial evidence. (*People* v. *Peters* (1957) 149 Cal.App.2d 94, 97 [308 P.2d 42].)

■ The testimony of Miss X before the grand jury was in general substance the same as that given by her at the trial, as outlined by us above, with certain qualifications which we shall point out. Describing the first examination or test which she had after January 7th, the witness testified before the grand jury that the defendant "kind of slipped down the robe and he exercised my breasts again. . . ." He then showed her the instrument he was going to use "[a]nd he used that. And then there was a slight pause. And now that I think back on what happened, he then used himself in the test." In her grand jury testimony relating to this visit, she described the difference of temperature in the object used in the two

parts of the test, but did not state, as she later did at the trial, that the second object was not as uncomfortable, or that it kept coming in and out of her vagina. Nor did she state before the grand jury that on any of the examinations she felt a throbbing in her vaginal region. She did however testify before the grand jury that during the examinations, several times during the pause between the two parts of the test ". . . I thought I heard a zipper and afterwards too." On the occasion of her last visit, on February 20th, she was satisfied in her own mind that the defendant's penis had penetrated her.

We are persuaded that from the testimony of Miss X presented to them, the strangeness of the circumstances, the unusual behavior of the doctor, the method of his examination, and the differences between the two parts of the examination, the grand jury could have reasonably inferred and believed that the defendant had accomplished an act of sexual penetration. Such inference was not precluded by the fact that the witness made some of the statements as she "thought back on it." Her recollection and narration of the events nonetheless were productive of competent credible evidence.

The testimony of Mrs. Z before the grand jury also was in general substance the same as that given by her at the trial, as we have heretofore set forth. We note certain qualifications. At the trial, the witness, referring to her last visit on February 27, stated "I heard a zipper." Before the grand jury she testified: "Well, I thought I heard him pull his zipper once," the record not being clear as to which visit she was referring. She also testified before the grand jury that on one occasion (not identified in the record) she tried to turn around during the examination but the defendant told her not to do so. At the trial, in response to a question as to whether at any time on the last examination she had attempted to look back, she testified "on several occasions. He would always tell me to stay as I was. . . ."

We are also satisfied that from the testimony of Mrs. Z presented to them, the grand jury could have reasonably believed that the defendant had similarly accomplished an act of sexual penetration upon her. Such an inference could have been properly and reasonably drawn not only from the evidence of the method and circumstances of the examination, as it was in the case of Miss X, but also from the defendant's behavior after the last examination in telephoning Mrs. Z almost immediately after she arrived home, thus showing his concern over the possible effects of his act.

We conclude therefore that, with respect to both count two and count five, the grand jury had "some rational ground for assuming the possibility that an offense . . . [had] been committed." (*Bompensiero* v. *Superior Court, supra,* 44 Cal.2d 178, 183.)

*Admission at trial of testimony of police officers and refusal of defendant's proposed instruction relating thereto.*

 Defendant contends that the court erred in admitting, over his objection, the testimony of Sergeant Ray and Captain Wathen of the Palo Alto Police Department dealing with the defendant's extrajudicial statements made to them relative to Miss X. At the basis of his objection is the claim that the corpus delicti of counts one and two involving Miss X had never been sufficiently established by proof independent of such extrajudicial admissions. This contention need not detain us long. As we have pointed out, the corpus delicti was sufficiently established independently of such admissions of the defendant, by the testimony before the grand jury. Such independent proof was even stronger at the trial as our outline of the trial testimony shows. In addition, the jury had before it the testimony of Dr. Harrison to the effect that the method of examination employed by the defendant and the instrument used by him, were most unusual in the light of accepted professional standards for the ailments complained of by the young women involved. From this evidence the jury could have well concluded that the defendant employed such methods not for proper medical purposes but to have sexual intercourse with his patients without their being conscious of the act.

Since the corpus delicti was established, the testimony complained of was properly admissible.[3]

 In addition, defendant claims that the trial court erred in refusing to give defendant's instruction number 21, requested by him in "carrying out the objections" to the above testimony of the officers. This instruction was in the following language: "Counts I and II of the indictment charge the defendant with having raped . . . [Miss X]. Before you can consider any statement or admission made by the defendant out-of-court concerning such alleged rape you must first find from the testimony of . . . [Miss X] that she was

---

[3]While defendant confines this contention to count two involving Miss X, we point out that for the same reasons the proof of the corpus delicti of count five, involving Mrs. Z, was stronger at trial and the testimony of the officers admissible as to the latter count also.

raped at or about the time set forth in the indictment. If you do not so find you must return a verdict for the defendant of not guilty on Counts I and II of the indictment.''

The court refused to give the above instruction on the ground that the subject matter was already covered by another instruction. This was presumably the People's instruction number 22 which reads: ''The guilt of a defendant may not be established alone by any confession or admission made by him outside of this trial. Before any person may be convicted of a criminal offense, there must be proof, independent of any such statement, that the crime in question was committed, but it is not necessary that such independent proof include proof as to identity of the person by whom such offense was committed.''

The instruction given, which is CALJIC No. 29-C, is a correct statement of the law and approved as such by the court in *People* v. *Garnier* (1950) 95 Cal.App.2d 489, 498 [213 P.2d 111]. Defendant does not claim otherwise. His argument is that the giving of the instruction was error in the instant case because it in effect told the jury that if the corpus delicti of *any one* of the five counts was established by the evidence, they could consider the defendant's extrajudicial statements on *each* of the five counts. This construction is farfetched and the contention for which it is offered is without merit.

The language of the given instruction is clear. It states that before any person may be convicted of *''a criminal offense''* there must be independent proof of the commission of *''the crime in question.''* The words ''offense'' and ''crime'' are in the singular. The respective phrases in which they appear express particularized concepts. Fairly read, the instruction told the jury that as to each count separately considered, independent proof of the corpus delicti had to be established. There could be no question in the jury's mind that they were to so consider each count separately in view of the following instruction which was also given by the court: ''The Indictment in this case contains five counts, that is, there are five *separate* charges of rape alleged in the Indictment. I *instruct you that you must consider each count* of the Indictment *as if that were the only charge* for which the defendant is on trial. When deciding the guilt or innocence of the defendant on *any one count* of the Indictment you cannot refer to, and must *put out of your mind,* the remaining

*four counts* of the Indictment. In other words, it is just as if the defendant were being tried *five separate times* for each of the counts of the Indictment.'' (Emphasis added.)

The jury apparently followed these admonitions as to the separateness of each count because it did return verdicts of acquittal on the counts dealing with Miss Y, refraining from considering in connection with them the extrajudicial statements of the defendant.

The subject was therefore properly covered and correctly stated by the instruction which was given. That it covered all five counts instead of only the first two counts as defendant's requested instruction did, did not render it unsuitable as a statement of legal principle for them. It is true defendant's authorities state that the trial court must instruct on every salient legal principle of the case,[4] but ''the trial court is not required to give a pertinent instruction in the language of the defendant or because so requested, if it is substantially covered by the charge which is given.'' (*People* v. *Eaton* (1923) 60 Cal.App. 612, 613 [213 P. 275].)[5]

*Failure of the evidence to establish offense on count two.*
As we have already pointed out, in respect to counts one and two, the prosecution elected to rely on the first act of intercourse shown to have taken place during the week following January 7, 1961. Defendant claims that the evidence fails to establish any such act to have taken place during such week and that there was thus a failure of the evidence to support the verdict.

The gist of defendant's argument is that the testimony of the victim bearing on her first visit after January 7 was not as strong as it was in respect to subsequent visits. Defendant points to her testimony that it was not until the third or fourth visit that she realized there was a difference in the temperature of the object used on her and not until after the last visit that she was sure the defendant was using himself. Such claims do not add up to a failure of evidence.

Defendant's argument is refuted on three grounds. First,

---

[4]Defendant cites *People* v. *Baker* (1954) 42 Cal.2d 550 [268 P.2d 705]; *People* v. *Hemple* (1906) 4 Cal.App. 120, 130 [87 P. 227]; *People* v. *Kane* (1946) 27 Cal.2d 693 [166 P.2d 285].

[5]Defendant's proposed instruction was itself erroneous. It is not a correct statement of law that the jury before considering extrajudicial statements, must first find proof of the corpus delicti *from the testimony of the victim.* As we have pointed out, it is only necessary that the proof be independent of the extrajudicial statements. It therefore may come from any other source and need not be limited to testimony of the victim.

the evidence which we have already summarized and need not repeat here, shows many facts in respect to the first test after January 7th from which the jury could conclude that a sexual penetration took place. Secondly, the subsequent similar examinations and unusual behavior of the defendant tended to show a common plan or scheme employed by him which was of direct probative value in proving that the offense with which the defendant was charged and which the prosecution elected to rely on was in fact committed by him. (*People* v. *Cassandras* (1948) 83 Cal.App.2d 272, 279 [188 P.2d 546]; *People* v. *Malloy* (1962) 199 Cal.App.2d 219, 230-234 [18 Cal.Rptr. 545].) Finally, the defendant's own admissions prove that on the visits subsequent to January 7, he accomplished an act of sexual penetration upon the victim.

*Error in giving and refusing instructions.*

(a) Rulings on objections to evidence.

As we have already pointed out, the two Palo Alto police officers testified to certain statements made to them by the defendant in which he said that he had been going to see Dr. Arthur Hardy, a psychiatrist, and had spoken to the latter about his contacts with Miss X. The prosecution called Dr. Hardy but, as we have also pointed out, the court after a few preliminary questions refused to permit him to be examined upon objection of the defendant based on existing privilege.

The court gave the People's instruction No. 7 but refused to give defendant's requested instruction No. 26 on the ground that it was covered by other instructions.[6] Both instructions dealt with the subject of the court's rulings on the admission

---

[6]People's instruction No. 7 given by the court reads as follows: ''At times throughout the trial the court has been called upon to pass on the question whether or not certain offered evidence might properly be admitted. You are not to be concerned with the reasons for such rulings and are not to draw any inferences from them. Whether offered evidence is admissible is purely a question of law. In admitting evidence to which an objection is made, the court does not determine what weight should be given such evidence; nor does it pass on the credibility of the witness. As to any offer of evidence that has been rejected by the court, you, of course, must not consider the same; as to any question to which an objection was sustained, you must not conjecture as to what the answer might have been or as to the reason for the objection.''

Defendant's requested instruction No. 26 refused by the court reads as follows: ''At times throughout the trial, the court has been called upon to pass on the question whether or not certain offered testimony might properly be admitted or whether a witness should be allowed to testify. You are not to be concerned with the reasons for such rulings and are not to draw any inference from such rulings either for or

or exclusion of evidence. Defendant claims error in both the giving of the former and the refusal of the latter.

Defendant argues that there is a "vast distinction" between the two, since the requested instruction dealt with the court's refusal to allow the witness to testify at all while the given instruction dealt with the exclusion of some testimony by a witness who testified on other matters. Defendant claims that the exclusion of all of Dr. Hardy's testimony called for the requested instruction containing this specific point. This was made necessary, so runs the argument, by the following evidentiary circumstances: The defendant denied that he stated to the police officers that he had told Dr. Hardy he had sexual contacts with his patients; there was some dispute as to exactly what Sergeant Ray testified to before the grand jury as to the defendant's statements but the grand jury transcript showed that, according to Ray, the defendant had stated to the police officers that he had had a mental problem for some time, had been seeing Dr. Hardy and had told the latter about sexual contacts with the three young women; the jury then had to decide between the testimony of the officers and the denial of the defendant; and the attempt to call Dr. Hardy must have caused the jury to believe he would corroborate the police officers.

The court did not err in giving People's instruction No. 7. This instruction, which is CALJIC No. 6, is a correct statement of the law and was given approval in *People* v. *Brown* (1958) 49 Cal.2d 577, 590 [320 P.2d 5]. In general substance it told the jury that they were to consider only the evidence admitted and were not to conjecture what the excluded evidence was or why it was excluded. It seems clear to us that this admonition applied not only to sustained objections to single questions but to sustained objections to a line of testimony or to the entire testimony of a witness. The instruction told the jury that " [a]s to *any* offer of evidence that has been rejected by the court, you, of course, *must not consider* the same; . . ." (Emphasis added.) While the last clause forbids conjecture "as to *any question* to which an objection has been sustained" we think that when examined in the context of the instruction as a whole, such language told the jury that they were not to speculate about any rejected testimony, be it

---

against the defendant. Such rulings are merely questions of law. As to any witness called in the case and whom the court has not allowed to testify, you cannot speculate or conjecture as to what the witness would have testified to or as to the reason for any objection that was made to such witnesses' testimony."

in answer to a single question or the entire testimony of the witness. Whatever the quantum, it was an "offer of evidence."

We feel, therefore, that the instruction given was adequate to take care of the evidentiary problem created by the calling of Dr. Hardy and that the substance of the requested instruction was covered by the given instruction. ▆▆ It is well settled that no error arises from the refusal of a requested instruction, if the rule of law stated therein has been covered by instructions given by the court. (*People* v. *Latona* (1935) 2 Cal.2d 714, 727 [43 P.2d 260]; *People* v. *Hall* (1934) 220 Cal. 166, 173 [30 P.2d 23, 996], appeal dismissed (1934) 292 U.S. 614 [54 S.Ct. 869, 78 L.Ed. 1473].) It is to be noted that the two instructions are remarkably similar in language. In the light of the above circumstances, the court was not required to give expression to the rule of law in the language of the defendant. (*People* v. *Eaton, supra,* 60 Cal.App. 612, 613.)

(b) Evidence of other acts of intercourse.

▆▆ Defendant contends that the court erred in giving People's instruction No. 28.[7] He claims that the instruction permitted the jury to consider evidence of other acts of sexual intercourse between the defendant and *any one* of the three prosecuting witnesses in deciding defendant's guilt or innocence of the offenses alleged to have been committed with

---

[7]People's instruction No. 28 given by the court reads as follows: "Although evidence was offered for the purpose of showing that on more than one occasion acts of sexual intercourse were indulged in and improper familiarity existed between the defendant and the prosecuting witnesses, you are not permitted to deliver a verdict of guilt in this case unless you find that the defendant committed the specific offenses which, the prosecution alleges in Counts One and Two, were committed on or about and during the week following January 7, 1961, or the specific offense which, the prosecution alleges in Counts Three and Four, was committed on or about February 2, 1961, or the specific offense which, the prosecution alleges in Count Five, was committed on or about February 27, 1961. The defendant is here on trial for only those offenses which are charged in the Information and upon which the District Attorney has elected to rely. Evidence, if any, which tends to show any other instance of sexual intercourse or of improper familiarity between the parties was received for a limited purpose only: not to prove distinct offenses or continual criminality, but to show that the barriers of modesty had been broken down by one of the two parties and that that party was sensually inclined toward the other, thus to corroborate other evidence, if any, tending to prove the specific offenses concerning which your verdict must be given.

"Such evidence was received also for the purpose of showing a continuing scheme or plan existent in the mind of the defendant.

"You are not permitted to consider such evidence of other conduct for any purpose other than those stated, and as to those purposes you must weigh the evidence as you do all other."

*any other* prosecuting witness. His position is that the court failed to instruct the jury that evidence of other acts of intercourse with any one of the complaining witnesses must be confined to the charge involving that witness.

The instruction states that "[s]uch evidence was received also for the purpose of showing a continuing scheme or plan existent in the mind of the defendant." This is an accurate statement. ▇▇▇ It is well settled that evidence of other offenses of a similar nature, including similar acts engaged in by the accused with persons other than the complaining witness are admissible to show a common plan or scheme. (*People* v. *Westek* (1948) 31 Cal.2d 469, 480 [190 P.2d 9]; *People* v. *Peete* (1946) 28 Cal.2d 306, 314-317 [169 P.2d 924]; *People* v. *Morani* (1925) 196 Cal. 154, 158 [236 P. 135]; *People* v. *Cassandras, supra,* 83 Cal.App.2d 272, 279; *People* v. *Malloy, supra,* 199 Cal.App.2d 219, 230-233; 22A C.J.S., Criminal Law, § 682, p. 729; 18 Cal.Jur.2d, Evidence, § 138, p. 588; Witkin, California Evidence, pp. 161-162.) The foregoing rule applies to sex cases generally. (*People* v. *Malloy, supra.*) ▇▇▇ In rape cases, evidence of similar sexual offenses against other women is admissible to show a common plan or scheme. (*People* v. *Cassandras, supra,* 83 Cal.App. 2d 272, 279-282; *People* v. *Crisafi* (1960) 187 Cal.App.2d 700, 706-707 [10 Cal.Rptr. 155]; *People* v. *Wojahn* (1959) 169 Cal. App.2d 135, 146-147 [337 P.2d 192]; *People* v. *Sullivan* (1950) 101 Cal.App.2d 322, 325-326 [225 P.2d 645]; *People* v. *Sullivan* (1950) 96 Cal.App.2d 742, 744-748 [216 P.2d 558].) As this court stated in *People* v. *Wojahn, supra,* "[t]he prosecution need not prove all elements of a prior offense beyond a reasonable doubt, since the defendant is not on trial for that offense." (169 Cal.App.2d at p. 147.)

▇▇▇ It is clear from the foregoing authorities that evidence of the defendant's acts committed on other prosecuting witnesses was relevant and admissible as to any offense involving a particular prosecuting witness, since it tends to show a common plan or scheme of which each of the several crimes was a part.[8]

Nor does defendant's criticism of the instruction have any validity insofar as it is directed against that part which states

---

[8]Miss Y, 16 years of age, testified that the defendant performed similar tests upon her on three occasions. We deem it unnecessary to set forth her testimony. While it does not contain some of the details found in the testimony of the other women, the general method of examination and the behavior of the defendant tend to show a plan and scheme of the defendant common to all three patients.

that evidence of other acts of sexual intercourse was received "to show that the barriers of modesty had been broken down by *one* of the *two parties* and that that party was sensually inclined toward the other, . . ." (Emphasis added.) In this part of the instruction it is obvious that the court was limiting its statement relative to other acts, to acts between two parties, the defendant and the complaining witness involved in the particular offense. This is the very limitation argued for by defendant.

*Coercion of verdicts.*

Defendant claims that the verdicts of guilty were coerced.

The jury retired at 2:43 p. m. on June 26, 1961. At 9:44 p. m. they returned to the courtroom to have the court clarify the question as to what verdicts were possible and again retired at 9:49 p. m. At 12:35 a. m. on June 27th, they were called back into the courtroom by the trial judge and the following took place: "THE COURT: . . . All right. The record will show that the jurors are all here and the defendant is present, and, Ladies and Gentlemen, I just called you out; you've been in there some time now, and it's about 12:35, and I just called you out to ask you whether or not you think you can reach a verdict; now, that's all I want to know. I don't know whether to send you to the hotel or let you go out and deliberate longer or what the score is.

"FOREMAN LYNCH: We haven't discussed this going to a hotel en masse, of course, but I felt personally, as Foreman of the jury, that we need possibly another hour to come to a complete decision. I think we would agree in total that this would be probably a wise move at this point because we covered a lot of ground.

"THE COURT: All right. Let's go back out and see what you can do?"

The jury then returned to the jury room at 12:36 a. m. At 1:50 a. m. (just 14 minutes over the estimated hour) the bailiff reported that they required another 5 or 10 minutes. At 2:07 a. m. the jury entered the courtroom and announced they had reached verdicts.

Defendant argues that the judge in effect threatened to lock the jurors up for the balance of the night and impliedly told the jury that a verdict should be reached. It is defendant's position that the court's remarks are susceptible of no other construction but that the court was of the opinion a verdict

should be reached and if it was not, the jury would be locked up.

As is stated in *People* v. *Boyden* (1960) 181 Cal.App.2d 48, 53 [4 Cal.Rptr. 869] : ''The determinative question presented by this assignment of error is whether the remarks of the trial judge complained of reasonably may be construed as amounting to coercion or as constituting an expression of the court's belief that the verdict should be against the accused.'' The court in *Boyden* quotes from 48 California Jurisprudence 2d, section 407, page 412, where it is said that: '' 'Although the court may impress the jury with the necessity, in the interest of the state and of the defendant, of reaching a verdict, it is reversible error to urge or coerce the jury, in terms or in effect, to bring in a verdict of guilty, or, with knowledge of how the jurors are divided, to express the court's belief that the verdict should be against the accused. Merely ordering the jury to retire for further consideration after they have announced that they are unable to agree does not, however, constitute coercion, nor does an inquiry directed simply to the numerical division of the jury or a direction that the jury make another attempt to analyze the evidence and arrive at some conclusion.' ''

We find nothing coercive in the court's remarks in the instant case. There was neither statement nor intimation by the court that it believed defendant guilty. The court made no comment of any kind upon the evidence, much less any statement implying that the jury should refrain from differences of opinion. No inquiry was made as to how the jury stood. There is nothing in the court's remarks amounting to a criticism or a scolding of the jury. Indeed, the only reasonable construction that can be placed on the remarks is that the court merely wanted to know ''whether or not'' the jury felt it could reach a verdict that night or how they felt generally about reaching a verdict. We can find in the remarks nothing even remotely resembling a threat by the court the jury had better reach a verdict or they would be locked up. On the contrary, we find in the remarks a solicitude of the court for a jury which had been deliberating for some 10 hours and for what they might desire to do about their further deliberations.

The instant case is clearly distinguishable from *People* v. *Crowley* (1950) 101 Cal.App.2d 71, 73-79 [224 P.2d 748] and *People* v. *Savage* (1954) 128 Cal.App.2d 123, 126 [274 P.2d 905] relied upon by defendant. In *Crowley* the jury

returned to the courtroom after four and one-half hours of deliberation and announced that they were unable to reach a verdict. The court thereupon made extensive remarks stating that the evidence although in some conflict was plain and clear, that it could not see anything in it to make it impossible for the jury to agree, that a retrial meant considerable expense to the county and the defendant, and that if the jury could not reach a verdict by 5 o'clock (38 minutes later), it would be locked up until the following morning. The court held that such remarks constituted reversible error. The difference between them and the court's remarks in the instant case is too obvious to require further comment.

In *Savage* the trial judge called the jury in after several hours' deliberation. He was told it stood " '11 to 1.' " He then said ". . . I am going to direct that you return to the jury room," made reference to the fact that it was the third day of the case and stated " '[i]t may be necessary to have you repair to a hotel tonight. . . .' " He further stated that " '[i]n any event, you will deliberate until 12:00' " (an hour and 20 minutes later) and if they did not reach a verdict, they would be sent to a hotel. This was followed by a voluntary statement of the court that in a criminal action, in the interest of both parties, it was advisable " 'that a verdict be returned, so that there may be an early conclusion of the case.' " The jury returned a verdict of guilty within 45 minutes. The court held that such attitude of the judge was similar to that in the *Crowley* case since it was clear that the judge wanted a conviction, that he knew or had reason to believe that the *eleven* jurors were for conviction and his threat of confinement in a hotel "became a potent weapon in the hands of the 11 jurors to force the one to agree with them." (128 Cal.App.2d at p. 126.) The circumstances in the instant case bear no resemblance to *Savage*. There was, as we have pointed out, no knowledge as to how the jury stood, no indication in any way by the judge that he wanted a conviction, and no similar circumstance of pressure brought to bear on a lone dissenting juror.

The judgment and order are affirmed.

Bray, P. J., and Tobriner, J., concurred.