Filed 7/23/14  P. v. Gonzalez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  The opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>SAMUEL GONZALEZ,<br><br>  Defendant and Appellant. | G048579<br><br>(Super. Ct. No. 12CF2735)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson.  Affirmed.

Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Michael Pulos, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Samuel Gonzalez of multiple counts of felony and misdemeanor false imprisonment (Pen. Code, §§ 236, 237; all statutory references are to the Penal Code unless noted), battery on a peace officer (§ 243, subd. (b)), carrying a dirk or dagger (§ 21310), and resisting and deterring an executive officer (§ 69). The jury found he committed the offenses for the benefit of a criminal street gang (§ 186.22, subds. (b), (d)). Gonzalez admitted he previously had suffered two prior convictions under the Three Strike law (§ 667, subds. (d) & (e)(2)(A); § 1170.12, subds. (b) & (c)(2)(A)), a serious felony prior conviction (§ 667, subd. (a)(l)), and served a prison term (§ 667.5, subd. (b)). Gonzalez challenges the sufficiency of the evidence to support the false imprisonment convictions and the gang enhancements. He also contends the trial court committed instructional error, and that it coerced the verdict. We affirm.

I

FACTS AND PROCEDURAL BACKGROUND

On September 13, 2013, Santa Ana Police Officers Luis Galeana and Gil Hernandez spotted Gonzalez walking down Bristol Street. Gonzalez made eye contact with the officers, grabbed his waistband, and ran. The officers pursued Gonzalez because Galeana suspected Gonzalez had a weapon in his waistband. Gonzalez scaled a fence and tossed something aside. Galeana, pursuing on foot, caught up with Gonzalez and ordered him to lie down on his stomach, but Gonzalez punched and kicked Galeana. He then fled, jumping over another fence and discarding a dagger.

Gonzalez made his way into Maria B.'s home through an unlocked sliding glass door. Maria lived with her husband, two children (Fabian B., age 11, and Julianna B., age 4), her mother and father (Beatriz A. and Enrique A.), and a cousin (Victor C., age 19). Maria first noticed Gonzalez as she huddled by her front door with Fabian, Julianna, and Beatriz after Fabian screamed there was a man inside the house. Maria felt afraid because Gonzalez, who was on his hands and knees and breathing hard, looked like

2

a gang member based on his baggy clothes and shaved head. Fabian tried to open the door to flee, but Gonzalez said, "nobody open." Beatriz kept Fabian from leaving the home.

Maria asked Gonzalez why he was in her home. He responded he had been walking with his girlfriend when police officers began hitting him. Gonzalez blocked Maria when she tried to go out through the side door, declaring, "No, you can't go nowhere. You need to shut up and hide me." Gonzalez had locked the back door when he first entered. He never physically touched Maria and pleaded for her help, using the Spanish word for "please."

Victor emerged from the bathroom and saw Gonzalez. Gonzalez ordered him not to open the door for the police. Victor retreated to his bedroom and alerted a police officer who stood outside his window that Gonzalez was inside the residence.

Maria and Gonzalez remained in the kitchen while Beatriz took Fabian and Julianna to her bedroom. Beatrice told Enrique about the intruder and ordered the children to hide under the bed. Enrique, who suffered from diabetes and blindness, remained on the bed. Beatriz locked her bedroom door before going back to the living room.

Gonzalez took Maria to the garage. Beatriz opened the front door and signaled to the police for help. She refused to step outside despite police requests to do so. The police entered the home and confronted Gonzalez, who kicked and threw punches at the officers as they subdued him.

Following trial in April 2013, the jury convicted Gonzalez as noted above. In June 2013, the court sentenced Gonzalez to 30 years to life in prison.

3

## II

### DISCUSSION

A. *Substantial Evidence Supports Gonzalez's Convictions for Misdemeanor False Imprisonment of Enrique (Count 1) and Julianna (Count 6)*

The jury convicted Gonzalez of falsely imprisoning Enrique (count 1) and Julianna (count 6) as lesser included offenses of hostage taking (§ 210.5). He contends the evidence did not establish he restrained, detained, or confined them, or that his acts forced them to stay in the house, or go somewhere else in the house against their will.

We "review the whole record in the light most favorable to the judgment . . . to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.) There is a difference between no evidence and insufficient evidence; to be sufficient, it must reasonably inspire confidence.

Section 236 provides, "False imprisonment is the unlawful violation of the personal liberty of another." Misdemeanor false imprisonment has two elements: the defendant intentionally and unlawfully restrained, detained, or confined a person, and defendant's act forced that person to stay or go somewhere against that person's will. (CALCRIM No. 1242.)

"Any exercise of express or implied force which compels another person to remain where he does not wish to remain, or to go where he does not wish to go, is false imprisonment." (*People v. Bamba* (1997) 58 Cal.App.4th 1113, 1123 (*Bamba*).) A person is liable for false imprisonment when he intentionally commits "an act, the natural, probable and foreseeable consequence of which is the nonconsensual confinement of another person." (*People v. Olivencia* (1988) 204 Cal.App.3d 1391,

4

1399-1400.) Gonzalez asserts Julianna B. or Enrique A. stayed in the house because Beatriz A. kept them there, not because he acted to restrain them.

Substantial evidence supports the jury's conclusion Gonzalez falsely imprisoned Julianna. His forcible entry into the residence and his command that everyone remain in the residence resulted in her confinement even if she was too young to fully comprehend what was occurring. As the Attorney General correctly notes, misdemeanor false imprisonment is established when a defendant commits an act which naturally and foreseeably results in the nonconsensual confinement of another person. (*People v. Fernandez* (1994) 26 Cal.App.4th 710, 717.) Here, the jury reasonably could conclude Julianna was confined in the living room, and Beatriz's removal of the children to another location in the residence was the natural, probable, and foreseeable consequence of Gonzalez's demand they remain in the residence and keep the doors closed.

Gonzalez also complains "it was not [his] intentional act that caused Enrique . . . to stay in the house and/or to hide; instead, it was Beatriz['s] acts that caused [him] to do so." Again, misdemeanor false imprisonment is established when a defendant commits an act which naturally and foreseeably results in the nonconsensual confinement of another person. The jury reasonably could conclude Enrique was confined, and Beatriz's instruction he should stay put was the natural, probable, and foreseeable consequence of Gonzalez's demand family members remain in the residence and keep the doors closed. Substantial evidence supports the jury's conclusion Gonzalez falsely imprisoned Enrique.

B. *Substantial Evidence Supports Gonzalez's Convictions for Felony False Imprisonment of Maria, Beatriz, and Fabian*

False imprisonment is elevated to a felony when a person confines or restrains another by "violence, menace, fraud or deceit." (§ 237, subd. (a).) The issue

5

here is whether Gonzalez employed "menace" in confining Maria, Beatriz, and Fabian. Menace means "'"a threat of harm express or implied by word or act."'" (*Bamba*, *supra*, 58 Cal.App.4th at p. 1123.) An "express or implied threat of harm does not require the use of a deadly weapon or an express verbal threat to do additional harm. Threats can be exhibited in a myriad number of ways, verbally and by conduct." (*People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1513 (*Aispuro*); see CALCRIM No. 1240.)

Gonzalez argues he did not verbally threaten harm to any of the people in the house, he did not act in a hostile manner, never told the adults he would harm them or the children, and on several instances begged Maria and Victor to either help him, or at least not let the police apprehend him, using the word "please" when asking for their help.

Here, the family lived in an area plagued by gangs, and Gonzalez appeared to be a gang member. Gonzalez barged into the home, demanded and directed various family members remain in the residence and hide him from pursuing police officers. He prevented Maria from leaving, and repeatedly ordered her to "shut up." Based on Gonzalez's appearance and aggressive conduct, Maria believed Gonzalez was a gang member and possibly armed. Maria and Beatriz testified they were frightened. Fabian, 11 years old at the time, was shaking and almost in tears. Based on the foregoing, the jury reasonably could conclude Gonzalez's presence and actions in the family's home carried an implied threat of harm. Substantial evidence therefore supports the convictions for felony false imprisonment of Maria, Beatriz, and Fabian. (See *People v. Islas* (2012) 210 Cal.App.4th 116, 126-127 (*Islas*) [substantial evidence supported conviction of false imprisonment by menace where family heard police activity outside their apartment building, noticed the defendants were in their home, defendants looked like gang members, defendants signaled for the terrified family to be quiet and to hide them, and apartment building was within area claimed by defendants' gang].)

6

Gonzalez's reliance on *People v. Matian* (1995) 35 Cal.App.4th 480 is misplaced. There, the defendant sexually assaulted the victim by squeezing her breast hard enough to cause pain and possibly bruising. As she prepared to leave, he grabbed her arm and yelled at her not to leave. (*Id.* at p. 485.) He told her to wash her face, and she retreated to a chair while he went into a nearby office within view of her. Each time she got up from her chair, he glared at her and stood up out of his chair to approach her. She testified she was afraid, did not want him to touch her again and sat back down. The appellate court held there was insufficient evidence of menace because the defendant did not use a deadly weapon, verbally threaten additional physical harm, or make threatening movements each time she got out of the chair to leave. (*Ibid.*) We agree with the cases that disagree with *Matian* on the law, and on its application to the facts of that case. (*Islas*, *supra*, 210 Cal.App.4th at pp. 125-126; *People v. Wardell* (2008) 162 Cal.App.4th 1484, 1491; *Aispuro*, *supra*, 157 Cal.App.4th at p. 1513; *People v. Castro* (2006) 138 Cal.App.4th 137, 143.) As noted by *Aispuro*, "[t]hreats can be exhibited in a myriad number of ways, verbally and by conduct" (*Aispuro*, at p. 1513) and "a jury properly may consider a victim's fear in determining whether the defendant expressly or impliedly threatened harm" (*Islas*, at p. 127.) Viewed in the light most favorable to the judgment, the jury here reasonably could infer Gonzalez's actions, demeanor, and statements conveyed an implied threat of harm should his victims attempt to flee.

C.     *The Trial Court Did Not Coerce the Verdict*

At 3:50 p.m. on the second day of deliberations, after the jury had deliberated eight hours in total over two days, the jury sent a note to the court stating, "[t]he members of the jury feel that further deliberation will not result in a different outcome for [counts] 1, 3, 4, 5, and 6," the hostage taking and false imprisonment counts. Defense counsel urged the court to declare a mistrial. The court declined, citing the eight days spent in trial, the amount of evidence received, and noted that the jury's

7

deliberations had been delayed while it waited for the court to answer the jury's inquiries. The court read an instruction (CALCRIM No. 3551)[1] urging the jury to continue their deliberations and, because it was 4:28 p.m. on a Friday afternoon, allowed the jurors to leave for the day, ordering them to return Monday morning. The jury deliberated about two hours on Monday and returned its verdicts.

Gonzalez argues the trial court's directive to the jury to resume deliberations after it advised the court further deliberations would not result in a different outcome improperly pressured the jurors to reach verdicts. "Here, the jurors . . . were forced to return on the following Monday for a third day of deliberations, even after reporting they were hung and did not believe further deliberations could help. [¶] This would have sent a very clear signal to the jury that the court wanted them to return verdicts and would not accept a 'hung' jury. The specter of 'coercion' thus arises."

As a threshold matter, Gonzalez forfeited the issue. When the trial court asked defense counsel if he had any objections, he replied that while he would prefer a mistrial, he had no legal objection to the court's course of action. Nothing in the record suggests the trial court understood the defense had qualms about jury coercion or felt the

---

[1]    "'Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict on one or more counts. Please consider the following suggestions. Do not hesitate to reexamine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views. Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict. Both the People and the Defendant are entitled to the individual judgment of each juror. It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective. Let me know whether I can do anything to help you further, such as give additional instructions or clarify instructions I have already given you. Please continue your deliberations at this time. If you wish to communicate with me further, please do so in writing using the form my bailiff has given you.'"

8

court was pressuring the jury. Counsel's failure to object in the trial court forfeited the issue on appeal. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1038 [due process coercion claim forfeited by defense counsel's failure to object]; *People v. Cain* (1995) 10 Cal.4th 1, 55 [defendant's failure to object forfeited claim the trial court's remarks directed a verdict].)

In any event, the claim fails on the merits, as we see nothing in the court's remarks that a reasonable juror would interpret as coercing a verdict. Section 1140 provides, "'[e]xcept as provided by law, the jury cannot be discharged . . . until they have agreed upon their verdict . . . unless, . . . at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.'" (*People v. Valdez* (2012) 55 Cal.4th 82, 159.) The trial court has discretion to determine whether a reasonable probability of agreement exists. (*Ibid.*) "The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency.'" (*People v. Rodriguez* (1986) 42 Cal.3d 730, 775, quoting *People v. Carter* (1977) 68 Cal.2d 810, 817 (*Carter*).) Gonzalez's reliance on *Carter* is unavailing. There, the trial court refused to give the jury the additional time it requested to deliberate, told the jury the evidence was not complicated, and admonished the jury it would be locked up for the night if no decision was reached within half an hour. (*Carter,* at pp. 819-820.) It was this behavior, not the directive to deliberate further, which led the appellate court to find an abuse of discretion.

Gonzalez argues we should infer the court coerced the jury because they quickly returned verdicts after reconvening on Monday, and the inconsistencies in the verdicts showed they were arrived at in haste. With respect to the speed of deliberations, Gonzalez points to *People v. Crowley* (1950) 101 Cal.App.2d 71, where the court reversed a verdict that was reached a half hour after the trial court further instructed the

9

jury. *Crowley* does not support Gonzalez's argument. As in *Carter*, the court threatened to lock up the jury for the night if they failed to reach a verdict. (*Crowley, supra,* at p. 79.) The present case is more like *People v. Sandoval* (1992) 4 Cal.4th 155, where the appellate court found no coercion when the trial court ordered deliberations to continue even though the jury already had conducted lengthy deliberations, advised the court it could not reach a verdict, and the jurors stated there was no reasonable possibility of a verdict with further deliberations. (*Id.* at p. 195; see *People v. Rodriguez, supra,* 42 Cal.3d at p. 775 [no abuse of discretion in requiring the jury to continue deliberating after it declared itself unable to reach a verdict following 18 days of deliberation].)

Contrary to Gonzalez's claim, purported inconsistencies in the verdict do not necessarily suggest jury compromises. A plausible reason the jury returned felony convictions for Gonzalez's false imprisonment of Maria, Beatriz, and Fabian, but not Julianna and Enrique, is that the latter two were not afraid of him: Julianna was too young to know what was going on, and Enrique never had contact with Gonzalez. Moreover, the jury may have acquitted Gonzalez on the count related to Victor because he did not verbally detain Victor. We discern no abuse of discretion in continuing deliberations another day.

D. *West Myrtle's Primary Activities*

Gonzalez challenges the sufficiency of the evidence to support the jury's finding on the gang enhancement. Gonzalez contends no substantial evidence supports the gang expert's opinion West Myrtle's primary activities included the sale of narcotics and the illegal possession of weapons. We do not find Gonzalez's contention persuasive.

Section 186.22, subdivisions (b) and (d), create an enhancement for "[a]ny person who is convicted of" specified crimes "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." A "'criminal

10

street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, *having as one of its primary activities* the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added; § 186.22, subd. (e)(1)-(25), (31)-(33) [enumerated crimes include sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances; prohibited sale, delivery, transfer or possession of firearms; theft and unlawful taking or driving of a vehicle].) The phrase "primary activities" as used in the gang statute means that one of the group's "'chief'" or "'principal'" occupations is the commission of one or more statutorily enumerated crimes. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at p. 324.)[2]

Detective Dominick Padilla testified as a gang expert at trial. According to Padilla, West Myrtle is one of the most active criminal street gangs in Santa Ana, with about 150 members and numerous rivals. Padilla had been involved in more than 15 investigations of West Myrtle, and had arrested several of its members. Padilla declared West Myrtle was a criminal street gang whose primary activities included illegal possession of weapons and sales of narcotics. He based his opinion on "speaking to members of the West Myrtle street gang, reviewing police reports regarding activity in that area, and speaking to members in the community, as well as senior investigators and

---

[2]    Here, the trial court instructed the jury it was required to find West Myrtle's primary activities included commission of "possession for sale of a controlled substance, possession of a firearm by a prohibited person, or carrying a loaded firearm in violation of Penal Code section 12031."

detectives in the gang investigations division."  He also provided three examples of West Myrtle gang members suffering convictions, specifically naming one West Myrtle gang member who suffered a conviction for possession of a controlled substance, another who suffered convictions for firearms violations, and Gonzalez's prior convictions in 2010 for two separate firearms violations.  Padilla testified officers provided Street Terrorism Enforcement and Prevention (STEP) notice to Gonzalez before the current incident and Gonzalez admitting "knowing that the gang is known for committing grand theft auto, GTA, weapon violations and sales of narcotics . . . ."

In *Sengpadychith*, *supra*, 26 Cal.4th 316, the Supreme Court stated the prosecution could satisfy the "primary activities" element by expert testimony of the type found in *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), where a police gang expert testified the defendant's gang "was primarily engaged in the sale of narcotics and witness intimidation." (*Sengpadychith*, *supra*, at p. 324.)  As the court explained, a gang expert may give opinion testimony based upon hearsay, including conversations with gang members and the defendant (*Gardeley*, *supra*, at p. 620 [expert based opinion on conversations with the defendants and with other Family Crip members, his personal investigations of hundreds of crimes committed by gang members, and information from his colleagues and various law enforcement agencies]).  The court also permitted an expert to rely on his or her personal investigation of past crimes by gang members and information about gangs learned from the expert's colleagues, or from other law enforcement agencies.  (*Sengpadychith*, *supra*, at p. 324.)

Gonzalez acknowledges "Padilla did offer his opinion that West Myrtle's primary activities were narcotics sales and weapons violations."  But he asserts Padilla's opinion was based on "conversations with colleagues in his Strike Force, officers from other divisions and West Myrtle members," and the trial court expressly instructed the jury it could not consider those statements as proof that the information contained in the

12

statements was true. During Padilla's testimony, the court provided the following instruction: "As Detective Padilla has done, and as he may continue to do, he has testified and may testify throughout the remaining portion of his testimony that in reaching his conclusions as an expert witness he considered statements and police reports made by other law enforcement officers. [¶] You may consider those statements contained in those police reports and those statements from those other law enforcement officers only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true." Gonzalez argues Padilla did not personally have sufficient expertise with crimes committed by West Myrtle members to support his opinion that narcotics sales and weapons violations were among their primary activities.

The question was whether *the jury* had sufficient evidence to conclude one of West Myrtle's "chief" or "principal" occupations was the commission of one or more statutorily enumerated crimes. We assume the jury followed the court's instruction and did not consider the hearsay statements relied on by the expert as proof the information contained in those statements was true, but it nevertheless could rely on the expert's opinion if it found an adequate basis supported the expert's testimony. Here, the prior offenses committed by West Myrtle gang members, including Gonzalez, supported Padilla's opinion West Mrytle's primary activities included illegal possession of weapons and narcotic sales, as did Gonzalez's admission that West Myrtle was known to commit the enumerated offenses.

Gonzalez argues Padilla testified not all of the 100 gang members he spoke to belonged to West Myrtle, his 50 arrests of gang members involved members of different gangs, and although he spoke to West Myrtle members about their activities, "he did not testify what those members told him their activities were." Of course, the jury could infer at least some of Padilla's information about West Myrtle's activities

13

came from his conversations with West Myrtle members. Gonzalez's arguments relate to the weight due Padilla's opinion, not the sufficiency of evidence on appeal. Nothing suggests Padilla's opinion concerning the primary activities prong lacked adequate foundation.

*In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.)* provides a study in contrast. There, the gang expert testified "'I know they've [gang members] committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.'" (*Id.* at p. 611.) The appellate court noted, "No specifics were elicited as to the circumstances of these crimes, or where, when, or how [the expert] had obtained the information. He did not directly testify that criminal activities constituted [the gang's] primary activities. Indeed, on cross-examination, [he] testified that the vast majority of cases connected to [the gang] that he had run across were graffiti related." (*Id.* at pp. 611-612.) The court also concluded the expert's testimony lacked adequate foundation. "We cannot know whether the basis of [his] testimony on this point was reliable, because information establishing reliability was never elicited from him at trial. It is impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay. [Citation.] [The] conclusory testimony cannot be considered substantial evidence as to the nature of the gang's primary activities." (*Id.* at p. 612, fns. omitted.) The court noted the expert's knowledge of the gang's activities could be based on reliable hearsay. (*Id.* at p. 612, fn. 3.) The court also determined the expert's testimony concerning two specific assaults committed by other gang members did not, taken together and without more, provide substantial evidence gang members had "*consistently and repeatedly*" committed enumerated crimes. (*Id.* at p. 614, fn. 5 ["two assaults committed in 2004, without more,

14

do not provide substantial evidence that gang members '*consistently and repeatedly*' committed the crimes enumerated in the statute"]; *People v. Perez* (2004) 118 Cal.App.4th 151, 160 [retaliatory shootings of individuals over a period of less than a week combined with a beating six years earlier insufficient]; cf. *People v. Vy* (2004) 122 Cal.App.4th 1209, 1225-1226 [three violent assaults by gang including current charge over less than three-month period was sufficient evidence predicate crimes were one of gang's primary activities].)

The expert testimony in *Alexander L.* differed from the expert testimony here, in at least two important ways. First, the prosecutor in *Alexander L.* failed to establish the foundation as to where, when, and how the expert obtained the information he used to formulate his opinion. (*Alexander L., supra,* 149 Cal.App.4th at p. 612.) Consequently, there was no way to know whether the information the expert cited was reliable. (*Ibid.*) By contrast, Padilla testified he reviewed police reports and gathered information from speaking with West Myrtle gang members and officers in the gang investigations division. Second, the expert in *Alexander L.*, never specifically testified about the gang's primary activities, merely stating he knew they had committed certain crimes. (*Id*. at p. 611.) By contrast Padilla described three incidents resulting in the convictions of West Myrtle gang members for weapons violations and the sales of narcotics, and this coupled with other testimony concerning Padilla's investigation of West Myrtle constituted sufficient evidence of the gang's primary activities. The case at bar is more properly compared to our decision in *People v. Martinez* (2008) 158 Cal.App.4th 1324 (*Martinez*). Here, as in *Martinez*, Padilla provided sufficient foundation because he had both training and experience as a gang expert, and he specifically testified about West Myrtle's primary activities. (*Id.* at p. 1330.)

15

*E.* *The Jury Was Not Given Contradictory Instructions Regarding Motive*

Gonzalez contends the trial court erred by providing CALCRIM No. 370 without specifying it did not apply to the section 186.22 gang enhancements.[3] As given to the jury, CALCRIM No. 370 provided, "The People are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict you may, however, consider whether the defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty." (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 503-504 [motive describes the reason a person chooses to commit a crime, which is different from a required mental state such as intent or malice].) Gonzalez argues "contrary to CALCRIM no. 370, motive is an element of the gang enhancements . . . , and the jury was so instructed. . . ." (See CALCRIM No. 1401 [gang enhancements required a finding the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang, and the defendant intended to assist, further or promote criminal conduct by gang members]; CALCRIM No. 1403 [jury could consider evidence of gang activity for limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge required to prove the gang-related enhancements or the defendant "had a motive to commit the crimes charged."].)

_____

[3] We assume Gonzalez did not forfeit his objection to the jury instructions by failing to raise them at trial. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1192 [defendant cannot complain on appeal that an instruction was too general or incomplete unless he requested clarifying or amplifying language; *People v. Smithey* (1999) 20 Cal.4th 936, 976 [defendant need not object to an instruction that incorrectly states the law and affects his substantial rights].) Gonzalez claims CALCRIM No. 370 incorrectly states the law because section 186.22 requires the prosecution to prove motive as an element of the gang enhancements.

16

According to Gonzalez, "[t]he emphasized sections of the statute and instruction highlight the requisite motive element underlying the accompanying acts. CALCRIM no. 370 therefore erroneously was given without clarification or modification, because it contradicted CALCRIM no. 1401 and CALCRIM no. 1403."

By its terms, CALCRIM No. 370 only applies to "the crimes charged," not enhancements. Thus, CALCRIM No. 370 did not contradict section 186.22 and CALCRIM Nos. 1401 and 1403, even if we accept Gonzalez's dubious assumption motive is an element of the gang enhancements. *People v. Fuentes* (2009) 171 Cal.App.4th 1133, rejected the argument Gonzalez raises and held that motive is not an element of a gang enhancement. As the *Fuentes* court explained, "[a]n intent to further criminal gang activity is no more a 'motive' in legal terms than is any other specific intent. We do not call a premeditated murderer's intent to kill a 'motive,' though his action is motivated by a desire to cause the victim's death." *(Id.* at p. 1139.) The combined instructions "told the jury [that] the prosecution must prove that [defendant] intended to further gang activity but need not show what motivated his wish to do so." *(Id.* at pp. 1139-1140.) Accordingly, "[t]his was not ambiguous and there is no reason to think the jury could not understand it." *(Id.* at p. 1140.) Finally, CALCRJM No. 1403, which told the jury it could consider gang activity evidence in deciding whether "[t]he defendant had a motive to commit the crimes charged," does not change the analysis. The prosecution was not required to prove motive, but the motive instruction correctly makes clear that "[h]aving a motive may be a factor tending to show the defendant is guilty." The prosecution was *permitted* to argue motive, even though it was not *required* to prove it. The trial court did not err.

17

## III

### DISPOSITION

The judgment is affirmed.


                                        ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.