Filed 11/17/15  P. v. Lewis CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B257324 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA079681) |
| v. | |
| WALTER LEWIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathryn A. Solorzano, Judge.  Affirmed.

Juliana Drous, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie A. Miyoshi and Nima Razfar, Deputy Attorneys General for Plaintiff and Appellant.

The District Attorney charged Walter Lewis (defendant) with robbing a Bank of America branch, and a jury found him guilty. The issue at trial was identity. Surveillance video cameras recorded the robbery, but no one present during the robbery positively identified defendant in six-pack photographic lineups. The prosecution called other witnesses who were not present but who were familiar with defendant's appearance—including Augustin Sanchez, a federal probation officer who supervised defendant and testified that defendant was the person depicted in the surveillance video. We are asked to decide whether the trial court committed prejudicial error when it permitted Sanchez to tell the jury that he was defendant's probation officer, and when it ruled the defense could not present certain testimony from defendant's friend, Maurice Soniat. We also consider defendant's claim that the trial court improperly exerted pressure on the jury to reach a verdict.

FACTS

Defendant was tried twice on the robbery charge. His first trial ended in a hung jury. He was retried and convicted. There were some differences between the two trials, notably the presence of defendant's friend Maurice Soniat at the first trial; the prosecution called Soniat as a witness, but he gave testimony favorable to defendant. We summarize the facts based on the evidence introduced at the second trial.

On December 29, 2011, a man approached bank teller Zhanna Tatevosyan in a Beverly Hills Bank of America branch. The man showed Tatevosyan a note that read, "Give me twenties, two thousand." Tatevosyan grabbed a pack of twenties which had a dye pack inside that would explode when taken outside the bank. The robber demanded hundreds instead. Tatevosyan activated a silent alarm while she got the hundred dollar bills. The robber complained that she was taking too long and threatened to hurt Tatevozyan, gesturing toward his pocket. Tatevosyan gave the robber five or six hundred dollar bills and he left. The robbery was recorded by surveillance video. Tatevosyan told police that the robber had a twisted goatee that was braided and that he was wearing a striped beanie.

2

Still photographs taken from the surveillance video were sent to various law enforcement agencies in the area. Augustin Sanchez, a federal probation officer, recognized the person in the photographs as defendant. Sanchez had supervised defendant between November 2010 and November 2011. During that time, he met with defendant on 15 occasions, with each meeting lasting 10 to 20 minutes. He recognized defendant in part by his long goatee and by the dreadlocks that defendant habitually wore under a hat.

Not long after the robbery, police stopped a car in which defendant was a passenger. Defendant's cell phone was recovered from the car. Phone records showed that around the time of the robbery, a cell phone tower about a quarter of a mile from the Bank of America branch received a signal from defendant's cell phone. The signal was received on the portion of the tower which faced toward the bank.

Beverly Hills Police Department Detective George Elwell interviewed defendant, who denied any involvement in the bank robbery and denied being in Beverly Hills at the time of the robbery. Defendant did acknowledge, however, that he had his cell phone with him on the day of the robbery and he admitted he would not let anyone use the phone outside his presence.

Detective Elwell showed six-pack photographic line-ups to several Bank of America employees. Tatevosyan selected two photographs as resembling the robber; one was defendant. In court, Tatevosyan did not identify defendant as the robber, but did not rule him out either. Two other bank employees did not identify defendant.

In his defense, defendant called the two Bank of American employees who did not identify him from the photographic lineups. One employee, Achilleas Yerou, testified that he could exclude five of the six photographs in the lineup as the robber, but could not exclude defendant's photo. Defendant also called a Beverly Hills police officer who testified that Tatevosyan had described the robber as in his early to mid-thirties wearing thick dark-framed glasses with a long braided goatee. Defendant was 54 years old when he was arrested.

The jury convicted defendant on the robbery charge, and we summarize the relevant facts concerning the jury's deliberations *post* at pages 14-15. The trial court sentenced defendant to a term of 25 years to life pursuant to the Three Strikes law plus two five-year enhancement terms pursuant to Penal Code, section 667, subdivision (a).[1]

## DISCUSSION

Defendant contends the court erred by excluding what he characterizes as exculpatory testimony from his friend Soniat, by permitting the jury to learn of his prior bad acts by allowing the testimony from his probation officer, and by limiting his cross-examination of the probation officer. He also contends that the prosecution presented false testimony by the probation officer. He further contends the trial court violated his right to a fair trial by pressuring the jurors to reach a verdict. We conclude there was no error, or that any error was not prejudicial, and therefore affirm.

### I. Restrictions on Testimony of Potential Defense Witness Soniat

#### A. Relevant background

At defendant's first trial on the bank robbery charge, the prosecution called defendant's friend Soniat. He testified he had known defendant for about 40 years and did not believe the person in the surveillance video was defendant. Detective Elwell and a second Beverly Hills Police Department detective testified that Soniat did identify defendant, and the police report they prepared so stated. Soniat denied telling Detective Elwell that the person in photos taken from the surveillance video was defendant.

During the second trial, the prosecution decided not to call Soniat as a witness. Defense counsel wanted to call Soniat to testify that he told Detective Elwell it was not defendant in the video and that he had read Detective Elwell's police report and it falsely stated that Soniat did identify defendant. The trial court ruled that Soniat could not testify about these matters unless Detective Elwell was procured as a witness. Defense

---

[1]     All further undesignated references are to the Penal Code.

4

counsel had previously agreed that Detective Elwell need not remain on call and could be excused. Defendant was not able to locate Detective Elwell and elected not to call Soniat as a witness.

B. Law and analysis

Defendant contends the trial court's limitation on Soniat's potential testimony denied him the right to present a critical defense. "[E]xcluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Boyette* (2002) 29 Cal.4th 381, 427-428.) For exclusion of defense evidence to rise to the level of a violation of a defendant's constitutional rights, "'the proffered evidence must have more than "slight relevancy" to the issues presented. . . . The proffered evidence must be of some competent, substantial and significant value.'" (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457.)

Soniat's testimony had only slight relevance to the issues presented and so its exclusion did not rise to the level of a constitutional violation. Detective Elwell offered no testimony about any purported identification by Soniat of defendant, and the police report stating Soniat identified defendant was not in evidence. Thus, Soniat's testimony was not needed to directly rebut any evidence offered at trial.[2]

Defendant contends, however, that Soniat's testimony would have had substantial and significant value because, if believed, it could have undermined Detective Elwell's credibility generally and caused the jury to distrust other portions of the detective's testimony. We are not persuaded because the matters to which Detective Elwell testified were either (a) uncorroborated but unimportant or (b) important but corroborated.

Although the detective opined that defendant was the person in the video, he claimed no special expertise in identifying people and no prior relationship with

---

[2] The trial court stated it would have allowed Soniat's testimony if Detective Elwell had been recalled as a witness and testified about his interview with Soniat and the police report the detective prepared.

5

defendant that would give weight to his identification. Rather, the detective acknowledged that he based his opinion that defendant was the person in the video on his "numerous" viewings of the video, not on identifications of defendant by others. Elwell's identification of defendant was therefore of little value to the jury's fact-finding task because he was in no better position than the jury itself—the jury could, and did, watch the video to determine whether it depicted defendant.

Detective Elwell did testify that defendant stated he had his cell phone with him on the day of the robbery and that evidence did place defendant in the vicinity of the bank around the time of the robbery. This testimony was important and of substantial value. However, Detective Elwell's interview with defendant was recorded, and a copy was provided to the defense. Although the recording was not played for the jury, there is nothing in the record that suggests Detective Elwell's testimony about the interview was inaccurate. Thus, there is no reason to believe that evidence of Soniat's testimony would have been significant; even if the jury had heard (and believed) Soniat's testimony it would not undermine Elwell's testimony about defendant's admissions. Because any testimony from Soniat about Detective Elwell would have had at most some slight relevance, exclusion of his testimony did not violate defendant's constitutional right to present a defense.

Moreover, defendant cannot show prejudice in any event. The evidence of his guilt was strong, particularly the cell phone records and the surveillance video, which the jury was able to view.[3] There is no reasonable probability that defendant would have

---

[3]    Cell phone records placed defendant in the vicinity of the bank at the time of the robbery. Two eyewitnesses indicated that defendant resembled the robber. Defendant had a long braided goatee as did the robber. The robbery was captured on surveillance video, and the jury was able to view both the video and defendant and make its own determination of whether defendant was the person shown in the video.

As we discuss in more detail in section V, *infra*, the jury deliberated for approximately two days without reaching a verdict. But once the jury was able to view the surveillance video using better technology with a clearer picture, it reached a verdict in a few hours.

6

received a more favorable verdict if Soniat had been permitted to testify as defendant desired.  (*People v. Watson* (1956) 46 Cal.2d 818.)[4]

## II.  Testimony by Defendant's Federal Probation Officer

### A.  Relevant background

Before trial, defendant moved pursuant to Evidence Code, section 352 to exclude evidence that prosecution witness Sanchez was his federal probation officer.  Defendant did not dispute that the prosecution was entitled to offer lay witness testimony from Sanchez identifying defendant.[5]  Some details of Sanchez's interactions with defendant were therefore relevant to an assessment of the accuracy of his opinion that defendant was the person shown in the surveillance video.  But defendant argued that allowing Sanchez to tell the jury his specific job title—that he was a probation officer (as opposed to a "government employee," the defense's preferred formulation)—had no relevance but did have prejudicial potential.

The trial court believed that Sanchez's occupation as a probation officer had substantial probative value because Sanchez "had a duty to monitor the defendant.  It was his duty and his job to observe him and supervise him.  It's not just like any government employee where you're dealing with a civilian and it's in the course of your day, and maybe that person, you'll remember their face, maybe you won't.  But when it comes to a probation officer, that probation officer has a duty to supervise that person.  They have the duty to know certain information about that person, where they live, and to monitor them to a particular degree."  The court stated it was concerned that it would be "a little misleading" to sanitize Sanchez's occupation even further because it may create an

---

[4]     We would reach the same result if we applied the standard for federal constitutional error.  (*Chapman v. California* (1967) 386 U.S. 18.)

[5]     As our Supreme Court has recognized, "Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs."  (*People v. Leon* (2015) 61 Cal.4th 569, 601.)

impression that the contacts between Sanchez and defendant were "potentially perfunctory contacts."

The trial court accordingly ruled that Sanchez could state he was a probation officer when testifying. The trial court believed that the fact that Sanchez was a *federal* probation officer had prejudicial potential because it would suggest that defendant committed a federal crime. Accordingly, the court "sanitized" Sanchez's title by telling the witness and the parties not to use the word "federal" in connection with Sanchez's job title. The trial court recognized that conviction of a state law crime also had prejudicial potential, but believed that it "can be dealt with by an instruction." The trial court left it up to defendant to "submit [such] an instruction for the court's review." Defendant's counsel did not request a limiting instruction concerning defendant's probationary status.

B.  Law and analysis

Trial courts have significant discretion when deciding whether the probative value of evidence or testimony is substantially outweighed by the danger of undue prejudice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) We accordingly review such decisions under the abuse of discretion standard. (*People v. Jablonski* (2006) 37 Cal.4th 774, 824; *Rodrigues, supra*, at p. 1124.)

Defendant argues that allowing Sanchez to tell the jury he was a probation officer was tantamount to admitting prohibited evidence of a prior bank robbery conviction by defendant in violation of his federal constitutional right to due process. But Sanchez did not testify that defendant had committed a crime. He simply testified that defendant was a "case" assigned to him to supervise. To be sure, Sanchez did testify that the FBI periodically sent emails with photos of bank robbery suspects to his office. However, he also testified that he supervised an average of 60 cases, and that the email with defendant's photo was shown to him by another officer in his office. Thus, Sanchez's testimony in no way suggested that defendant had a prior conviction for bank robbery. There was no violation of defendant's due process rights.

8

We further conclude that the court's decision to allow Sanchez to state his title as a "probation officer" was not an abuse of discretion and was harmless in any event. The number of times, length of time, and settings in which Sanchez had previously observed defendant—including the photo of defendant Sanchez had on his computer—were unquestionably relevant to assess the accuracy of his lay opinion that defendant was the person shown in the surveillance video. The probation officer's title in and of itself was not especially relevant because of any particular skills of observation that such officers possess. We do agree, however, that the defense's proffered alternative ("government employee") carried with it its own risks of misleading or confusing the jury about the reasons Sanchez would have for monitoring defendant's behavior and the nature of the interactions between the two. Under the circumstances, Sanchez's occupation as a probation officer was intertwined with the facts that were indisputably relevant (the nature of his interactions with defendant) and the balance struck by the trial court— permitting Sanchez to state his title but excluding any reference to his status as a federal officer and offering a limiting instruction—was not an abuse of discretion. Moreover, the evidence against defendant was strong and there is no reasonable probability that defendant would have received a more favorable outcome even if Sanchez had been precluded from making any reference to his job title. (*People v. Mullens* (2004) 119 Cal.App.4th 648, 659 [error in admission or exclusion of evidence following an exercise of discretion under section 352 tested for prejudice under the *People v. Watson, supra,* 46 Cal.2d 818 standard].)

### III. Confrontation and Cross-Examination of the Probation Officer

#### A. Relevant background

Sanchez explained during direct examination that his testimony about the number of visits he had with defendant had increased from 12 at the first trial to 15 at the second trial because between trials he had reviewed his notes and that refreshed his recollection. Sanchez similarly explained that his testimony about defendant wearing glasses had changed since the first trial because between trials he had looked at a photograph of

9

defendant in his computer system and that refreshed his recollection. It is undisputed that Sanchez, as an employee of the United States District Court, could not turn over work-related documents without permission from that court.

On cross-examination, defense counsel asked Sanchez, "isn't it true that I had on previous occasions and on multiple times requested those notes from you?" The court sustained the prosecution's objection to this question and precluded any further questioning by defendant on this topic.


B. Law and analysis

Defendant asserts the trial court's ruling denied him his federal constitutional right to confront and cross-examine the witnesses against him. Defendant offers very little by way of argument in his opening brief to support this assertion. The failure to present specific argument, as opposed to a general assertion, forfeits a claim of error. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [deeming waived a defendant's argument on appeal that merely "makes a general assertion, unsupported by specific argument"]; *People v. Hardy* (1992) 2 Cal.4th 86, 150 [rejecting due process claim because other than a brief mention of the argument, appellant did nothing to expand on the issue].) Defendant does make a more detailed argument on this issue in his reply brief, but that is ordinarily insufficient to cure a point insufficiently raised in the opening brief. (*People v. Newton* (2007) 155 Cal.App.4th 1000, 1005.)

In any event, defendant's argument, as developed in his reply brief, lacks merit. Defendant claims that what was "relevant" in his line of questioning was "the fact that Sanchez did not cooperate in getting the notes to defense counsel." Presumably defendant believes this non-cooperation would show bias on the part of Sanchez and thus go to his credibility.

"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences

10

relating to the reliability of the witness.'" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680, quoting *Davis v. Alaska* (1974) 415 U.S. 308, 318.) "[N]ot every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. (*Van Arsdall, supra,* 475 U.S. at pp. 678-679; see [*People v.*] *Cooper* [(1991)] 53 Cal.3d [771,] 817.) California law is in accord. (See *People v. Belmontes* (1988) 45 Cal.3d 744, 780.) Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' (*Van Arsdall, surpa,* 475 U.S. at p. 680), the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment. (*Cooper, supra,* 53 Cal.3d at p. 817.)" (*People v. Frye* (1998) 18 Cal.4th 894, 946, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390.)

Defendant has not shown how cross-examination of Sanchez on the topic of his notes would have produced a significantly different impression of Sanchez's credibility. In the trial court, defendant argued that this line of questioning was relevant to show that there was no way he could determine if Sanchez was testifying accurately about his notes. Sanchez's testimony about the notes indicated that he referred to them to refresh his recollection about the details of his interactions with defendant before the second trial. He stated that the notes showed he met 15 times with defendant rather than the 12 times Sanchez had testified to in the first trial. He also stated that he pulled up a photograph of defendant that showed defendant with glasses at neck level, rather than without glasses entirely as Sanchez apparently had previously testified. While both changes would, if they had any impact, strengthen rather than weaken Sanchez's identification, the changes are so minor that any impact is unlikely. Further, in changing his testimony, Sanchez in effect "impeached" himself by acknowledging that his prior testimony had been inaccurate. Even if defense counsel had obtained the notes, further questioning on this topic would have been unlikely to produce a different impression of Sanchez's credibility.

11

In addition, the only basis to conclude Sanchez was non-cooperative raised by defense counsel in the trial court was an argument that counsel's research showed that Sanchez had an obligation to turn over a subpoena he received from the defense to the federal district court. Counsel did not cite any authority for this proposition.[6] Defense counsel made the argument in response to the prosecution's claim that he did not go through the proper process for obtaining the notes. Defense counsel did not argue that he should be permitted to question Sanchez on his lack of cooperation to impeach his credibility. Since defendant did not seek to confront Sanchez about his supposed non-cooperation, this argument fails.

### III. Probation Officer – False Testimony

#### A. Relevant background

As we have already described, defense counsel asked Sanchez on cross-examination if he (defense counsel) had previously requested Sanchez's notes. The prosecution objected, but not before Sanchez replied, "Yes." The prosecution sought and received permission to question Sanchez further about this topic. On redirect, the prosecution asked Sanchez if he had the authority to turn over the notes to defense counsel or to the prosecution. Sanchez replied, "No." The prosecution then asked, "Did you explain to the defense attorney exactly what the procedure was for how he was to go about obtaining those documents if he wanted to see them for himself?" Sanchez replied, "Yes." Sanchez testified that he had explained the process two or three times.

---

[6]     We note that defendant's reply brief contains an extensive discussion of a method to obtain the probation officer's notes that he believed must have been known to the prosecution and the probation officer and that they failed to disclose to him. Although such withheld knowledge could show non-cooperation, the issues raised by such non-cooperation do not clearly implicate the confrontation clause. Further, since this issue was never raised in the trial court, there is no evidence in the record about this method or the prosecution's or the probation officer's knowledge of it. Thus, any claims arising from allegedly concealed knowledge cannot be raised on direct appeal.

B. Law and analysis

Defendant contends these questions from the prosecution elicited false testimony from the probation officer because that testimony implied that defense counsel could have obtained copies of the officer's notes when in fact counsel could not. He further contends this behavior violated his constitutional rights to due process.

"[A] prosecutor's knowing use of false evidence or argument to obtain a criminal conviction or sentence deprives the defendant of due process. . . . " (*People v. Sakarias* (2000) 22 Cal.4th 596, 633.)

There is no evidence in the record that shows defense counsel could not have obtained the officer's records. The parties agreed that the probation officer and/or his companion stated either that they "doubted" defense counsel would get the documents or that defense counsel "probably" would not get the documents. There is no way to know if these statements were accurate or not. As the trial court and the prosecution pointed out, if defense counsel wanted to argue that he could not obtain the notes, he should have served a subpoena on the district court that controlled the notes.[7] Thus, even assuming the probation officer's testimony implied that defense counsel could have obtained copies of the notes, the record on appeal does not show that the prosecution knowingly presented false testimony. There was no violation of defendant's due process rights.

## V. Jury Coercion

Defendant contends the trial court coerced the jury into returning a unanimous verdict by requiring jurors, who stated they were deadlocked, to return the next morning for a last vote. He further contends this coercion violated his Sixth Amendment right to a

---

[7] We recognize that defendant contended in the trial court that the probation officer should have turned over the subpoena he received to the district court, and contends in his reply brief on appeal that there is a procedure that the prosecution could have used to obtain the notes. Defendant's contention in the trial court was not supported by any cited authority. Any claims about the procedure known to the prosecution would have to be raised in a petition for writ of habeas corpus.

13

fair trial. We hold the trial court's actions were not coercive and there was no violation of defendant's right to a fair trial.

### A. Relevant background

At approximately 10:12 a.m. on the second day of deliberations, the jury indicated that it had taken multiple votes and that it was evenly split, 6-6. The court asked if additional argument from counsel would be helpful. The foreperson indicated that better technology to view the surveillance video might be helpful. The foreperson acknowledged that the definition of reasonable doubt still presented a problem for the jury. The court permitted counsel to present additional argument on the reasonable doubt standard. After the additional arguments, the foreperson offered to use her own personal laptop to view the video. The court allowed this, with restrictions.

At about 2:57 p.m., the jury submitted a note to the court stating that there had been "movement in the jury's decision" but it was still unable to reach a unanimous decision. The foreperson told the court that the split was now 11 to 1. The foreperson did not reveal the direction of the split.

The court viewed this as a "significant shift" in a short period of time. The court asked if it would be useful for the jurors to take a break and come back the next morning for a final vote. One juror agreed that it "might be helpful for the group." The other 11 jurors did not think it would be useful. The court explained that the shift in the voting had caused it "to stop and ask whether it would be best for all of you to go home right now, sleep on it, and come back tomorrow morning. Can you come back with your decision in the morning? You don't have to stay here all day tomorrow. Come back in, take a vote tomorrow morning. Sometimes it's good to step away from the process, clear your heads and do that." The court then discussed the matter with counsel, pointing out that the one juror who agreed might be "potentially the one juror that's the hung juror." The court also pointed out that the 11 to 1 split on further deliberations is "kind of indicative of where the jury is right now." The court decided to have the jury return the next morning.

The court told the jury: "I am going to have you come back in the morning, go into the jury room and chat. And you will not be required to deliberate all day tomorrow. I would like you all to exit this courtroom, exit that jury room, have some freedom and then come back tomorrow and take a vote and let me know where you stand tomorrow morning."

The next morning, after spending about 24 minutes in the jury room, the jury notified the court that it had reached a verdict. Following the release of the jurors, defense counsel spoke to the jurors and informed the court that watching the video on the newer laptop had made the difference for the holdout juror.

B. Law and analysis

"The applicable legal principles are well established. Under section 1140, the trial court is precluded from discharging the jury without reaching a verdict unless both parties consent or 'unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.' We have explained that '[t]he determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court.' [Citation.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency." [Citations.]' (*People v. Rodriguez* [(1986)] 42 Cal.3d 730, 775; see *People v. Rojas* (1975) 15 Cal.3d 540, 546; *People v. Carter* (1968) 68 Cal.2d 810, 817.)" (*People v. Sheldon* (1989) 48 Cal.3d 935, 959.)

When faced with a jury that claims it is deadlocked, "'a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least consider how it can best aid the jury.' [Citation.]" (*People v. Young* (2007) 156 Cal.App.4th 1165, 1171-1172 [italics omitted].) As long as the trial court avoids coercing the jury to reach a verdict, there is no bar against inquiring into the possibility of agreement and it is not coercive to suggest further deliberations. (*People v. Bell* (2007) 40 Cal.4th 582, 616.)

15

Although defendant attempts to compare this case to other cases to show coercion, such comparisons are not useful. The question of coercion is necessarily dependent on the facts and circumstances of each case. (*People v. Breaux* (1991) 1 Cal.4th 281, 319.) The circumstances in the cases cited by defendant are not comparable to the situation in this case. In *People v. Crowley* (1950) 101 Cal.App.2d 71, for example, the court told the jury that if they did not reach a verdict by 5:00 p.m., the jury would be locked up for the night and returned to the courtroom in the morning. (*Id*. at p. 75.) In *People v. Crossland* (1960) 182 Cal.App.2d 117, the court told the jury at 9:38 at night that it did not understand why the jury could not reach a verdict in such a simple case, and sent them back for further deliberations. (*Id*. at p. 118.)

Here, although the jury had deliberated a relatively long time compared to the length of the trial, there had been a significant shift in the afternoon of the second full day of deliberations. The trial court could reasonably conclude that an overnight break might refresh the jury and result in a freer and less pressured final vote the next morning. Because the court made it clear that the jury would not be required to deliberate all the next day, there was no reason for the jury to feel pressured into agreeing.[8]

---

[8] The trial court's question asking the jurors if they could come back with their decision in the morning was not coercive. Nothing about the question suggested jurors should no longer exercise their individual judgment, and in context, we read the court's reference to a "decision" to be a decision about whether they continued to be deadlocked.

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:



MOSK, Acting P.J.



KRIEGLER, J.

17